NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 79

No. 2014-190

| | |
|---|---|
| In re North East Materials Group LLC ACT 250 JO #5-21 (Russell Austin, Pamela Austin, Julie Barre, Marc Bernier, et al., Appellants) | Supreme Court<br><br>On Appeal from<br>Superior Court,<br>Environmental Division<br><br>November Term, 2014 |

Thomas G. Walsh, J.

Douglas A. Ruley, Environmental and Natural Resources Law Clinic, South Royalton, for Appellants.

Alan P. Biederman of Biederman Law Office, Rutland, and James P. W. Goss of Kenlan, Schwiebert, Facey & Goss, P.C., Rutland, for Appellees.

PRESENT: Dooley, Skoglund, Robinson and Eaton, JJ., and Morse, J. (Ret.), Specially Assigned

¶ 1.     **ROBINSON, J.**   This case calls upon us to consider whether a post-1970 rock-crushing operation is exempt from Act 250 because it is located on a site within a large tract that includes multiple quarries and is a pre-1970 development itself exempt from Act 250 permitting requirements. The Superior Court, Environmental Division concluded that the pre-1970 dimension-stone-quarrying operations included intermittent crushing operations throughout the large tract, and that the new crushing operation thus fell within the grandfathered development and did not constitute a cognizable physical change to that preexisting development. We conclude that the Environmental Division used the wrong legal framework in considering whether the crushing operation constitutes a cognizable change, and that a critical finding

underlying its analysis is unsupported by the evidence.  Accordingly, we reverse and remand for further proceedings.

I.

¶ 2.    Between 2008 and 2012, successive district coordinators of the District 5 Environmental Commission issued a series of jurisdictional opinions, each determining that the initiation of rock-crushing operations by North East Materials Group LLC (NEMG) at a site within the Rock of Ages Corporation (ROA) quarry did not require Act 250 permit review because those operations did not constitute a cognizable change to a development that existed on June 1, 1970, the effective date of Act 250.  Thirteen individuals denominating themselves Neighbors for Healthy Communities (Neighbors) appealed a September 2012 decision to the Environmental Division, which likewise concluded that the rock-crushing operations did not effectuate a cognizable change to the preexisting quarry development, and therefore no Act 250 permit was required.

¶ 3.    The Environmental Division made the following findings, which are uncontested on appeal, except where noted.  ROA owns and operates a quarrying operation on a tract of approximately 1170 acres (930 acres in Barre and 250 acres in Williamstown).  The site includes several quarries which were formerly owned and operated by distinct entities.  The quarries are adjacent to each other in a configuration running roughly from north to south.  Several roads, including Graniteville Road, transect the property; others connect work sites on the property.  NEMG's crushing operation at issue here is located south of Graniteville Road.

¶ 4.    Granite quarrying involves the cutting and extraction of large blocks of stone for sale or further processing.  The most desirable kind of granite is high-quality "dimension stone."  This stone is typically found deeper in the earth.  In contrast, lower-quality "bedding" stone lies on the upper levels, close to the surface, in the "overburden" (i.e., stone, soil, and rock unsuitable for monument use).  Typically, ROA must remove between eighty and two hundred feet of such

2

material to reach dimension stone. Up to eighty percent of material quarried is waste. Crushing this material and reducing it to usable and salable sizes is a common industry practice, allowing quarrying operations to make use of otherwise useless waste material. Crushing entails drilling, blasting, and removing rock, and transporting it to crushing equipment. A primary crusher crushes the rock initially; smaller crushers further reduce rock sizes; and screens are used to separate the crushed rock by size so the end product may be grouped and sold. The crushed material is typically transported off-site in dump trucks. Neighbors in the area of NEMG's crushing on ROA's tract experience noise, dust, and traffic. Common noises are material being loaded or unloaded. Dust accumulates on house windows, outside furniture, lawns, and cars. Dump trucks traveling to or from the crushing site also cause traffic and kick up dust.

¶ 5. Dimension-stone-quarrying operations on what is now the ROA tract first began in the 19th century. Those quarrying operations included rock-crushing operations as early as 1904 and have included intermittent crushing operations at various locations within the ROA tract through the present day. The Environmental Division noted photographic evidence of crushing activity around 1912 south of Graniteville Road, in close proximity to NEMG's current crushing location. The Environmental Division made no findings as to the volume of crushing activity at the site during that time period, or the duration of those operations.[1]

¶ 6. The Environmental Division further found that the former Wells-Lamson Quarry Company conducted crushing, including a crushing operation producing poultry grit and road aggregate, as far back as 1926. This crushing continued through the 1940s and into the 1960s. The Environmental Division made detailed findings as to the volume of Wells-Lamson's rock-crushing operations in 1958 and 1959. Those operations provided granite sub-base for Interstate 89. The crushing operation, which ceased shortly after 1959, had a capacity of a thousand tons per day. Railcars with a capacity of approximately a hundred tons of crushed rock were used to

---

[1] There was no evidence of any crushing activity on or near this site after the 1920s.

transport the crushed material.  Hundreds of railcars of crushed rock were transported for Interstate 89 development.[2]

¶ 7.    In addition, the Environmental Division found that Kelley Construction, Inc. contracted with ROA in August 1969 to remove overburden and rock in the Smith Quarry, which was located in the middle of the ROA property, north of Graniteville Road, about 0.8 miles from the site at issue in this case.  The contract contemplated the crushing of approximately 40,000 cubic yards of material, and the work was undertaken between September 1969 and April 1970.

¶ 8.    The Environmental Division made findings of extensive crushing activity <u>after</u> 1970.  In particular, Cooley Asphalt Paving Corporation removed and crushed an estimated 200,000 tons or more of granite during the ten-year period beginning in 1988, and had been removing and crushing granite at times even before that period.  McCullough Crushing, Inc. removed more than 55,000 tons of crushed granite from a quarry south of Graniteville Road in 1990 using equipment similar to NEMG's crushing equipment.  In 1992 and 1993, crusher material was hauled from three different areas on the ROA property for crushing off-site.  The E.L. Smith & Company quarry, located approximately 0.8 miles north of the NEMG operations, engaged in crushing activity from 2005 to 2007.

¶ 9.    Finally, NEMG itself, after the District 5 Environmental Commission Coordinator determined that no Act 250 review was required, began rock-crushing operations at the present site in 2009.[3]  Its equipment includes two jaw crushers, a cone crusher, a triple-deck screen, loaders, and excavators.  The crushed material is transported off-site by customers using their own trucks; NEMG owns one truck that hauls grout, but no delivery trucks.  In June 2013, the Agency of Natural Resources (ANR) issued an air-pollution-control permit to NEMG, allowing

---

[2]  ROA concedes that the location of this high-volume crushing operation was never established.  As noted in more detail below, the evidence suggests that it was <u>not</u> on property within ROA's current tract.

[3]  NEMG's crushing operations have moved around the property over time.

4

it to install various types of crushing equipment, including up to two primary crushers, two secondary crushers, three screening decks, discharge and stacking conveyors, and a diesel-powered electric generator. The extent of NEMG's crushing activity varies with the season and with shifting demand. NEMG crushed 20,285 tons of material in 2010; 155,577 tons (over 53 days) in 2011; 89,667 tons (over 83 days) in 2012; and 59,279 tons (over 43 days) in 2013.[4]

¶ 10. Based on these findings, the Environmental Division concluded that the challenged crushing operation was part of a pre-1970 development. It stated that rock crushing is not "separate and distinct from other quarrying activities," but rather is part and parcel of the dimension-stone quarrying that had been taking place on the ROA property for over a century. In reaching this conclusion, the Environmental Division explained that the large-scale rock-crushing activities on the tract north of ROA's properties "does not itself indicate ROA's preexisting development," but does support the finding of a relationship between quarrying and rock-crushing. The Environmental Division concluded that "the ROA quarrying operations, including intermittent and portable crushing activities, are a preexisting development within the meaning of [Act 250]." It explained that it could properly consider pre-1970 crushing activity by entities other than ROA on property that was previously not held in common ownership with the other contiguous ROA quarries because the preexisting development exemption from Act 250 jurisdiction attaches to and runs with the land, rather than particular owners.

¶ 11. The Environmental Division rejected the argument that because the ROA tract is made up of smaller quarries, some separated by public roads and at distances of up to several miles from each other, the historical evidence of crushing in one location should not be held to establish a preexisting practice in another. It explained that whether a development was "preexisting" would not be determined by looking at individual quarries, but rather by looking at

---

[4] The spike in the amount of crushed material in 2011 was due to the State's suspension of enforcement of certain regulatory limitations on gravel extraction following Tropical Storm Irene. There was an increased need for material to rebuild infrastructure destroyed in that storm.

the "overall . . . preexisting development": the dimension-stone quarrying and associated crushing activity over ROA's entire 1170 acres.

¶ 12. The Environmental Division also rejected Neighbors' claim that ROA's crushing operations had been abandoned, and were therefore not eligible for "grandfathering" under Act 250. The Environmental Division noted that the dimension-stone quarrying had continuously taken place at the ROA quarry for over a hundred years, and that over that time there had been fairly consistent but intermittent crushing operations on the tract. Given this, and its finding that crushing rock intermittently and at various locations is customary in the industry because the source of material, waste-material levels, and demand for crushed rock vary, the Environmental Division concluded that ROA's preexisting development, including crushing, had not been abandoned.

¶ 13. Finally, the Environmental Division addressed Neighbors' claim that even if rock-crushing was a preexisting development, NEMG's crushing operation constituted a "substantial change" to that development that was therefore subject to Act 250 permit review. Neighbors argued that the addition of new rock-crushers to supply large quantities of asphalt to a proposed hot-mix asphalt plant on-site and NEMG's 2012 air-pollution-control permit from ANR authorizing it to crush up to 175,000 tons per year established a substantial change which would bring the crushing activities under Act 250 jurisdiction.[5]

¶ 14. The Environmental Division found that no cognizable change in rock-crushing activity had occurred. Viewing the entire 1100-acre tract as a single granite-quarrying operation, and viewing intermittent rock crushing at varying locations as an established component of the larger quarrying operation, it found that Neighbors had "failed to meet their burden of

---

[5] ROA is engaged in separate litigation concerning a proposed 180 ton/hour hot-mix asphalt plant on ROA's property. Several local residents appealed the district environmental commission's award of an Act 250 permit for the project to the Environmental Division, and the case is still pending. In re N.E. Materials Grp., LLC Act 250 Permit, 35-3-13 Vtec (Vt. Super. Ct. Envtl. Div.). Issues relating to the asphalt plant are not before us in this appeal.

6

demonstrating that NEMG's crushing represents a cognizable physical change to ROA's preexisting development." As a result, the Environmental Division did not consider the potential impacts of the crushing operation because it concluded that ROA and NEMG did not need to obtain an Act 250 permit "to crush rock at the NEMG crusher site at levels customarily associated with ROA's operation."[6] Neighbors appealed to this Court, challenging both the Environmental Division's legal approach and the evidentiary basis for its findings. We consider each in turn.

## II.

¶ 15. Act 250, 10 V.S.A. §§ 6001-6093, was enacted "to protect Vermont's lands and environment by requiring statewide review of large-scale changes in land utilization." In re Audet, 2004 VT 30, ¶ 13, 176 Vt. 617, 850 A.2d 1000 (mem.) (quotation omitted). Act 250 ordinarily requires a permit prior to the commencement of development. 10 V.S.A. § 6081(a).[7] However, the permit requirement does not apply to development commenced before June 1, 1970 (the date Act 250 became law). Id. § 6081(b); see also Act 250 Rules, Rule 2(C)(8).[8] The scope of this grandfathering provision is, in turn, limited by a provision that "any substantial change in such excepted subdivision or development" is subject to the ordinary permit requirement. 10 V.S.A. § 6081(b). "Substantial change" is defined as "any change in a preexisting development . . . which may result in a significant adverse impact with respect to any of the [ten Act 250 criteria]." Act 250 Rules 2(C)(7), Code of Vt. Rules 12 004 060-3.

---

[6] The Environmental Division acknowledged that the rock crushing "creates various impacts, including noise, particulate matter in the form of stone dust, and truck traffic and congestion" adversely affecting Neighbors, but held that it "did not have jurisdiction to review these alleged impacts" in the absence of a finding of a cognizable change.

[7] ROA does not dispute that the crushing operations here are "development" within the meaning of Act 250. See 10 V.S.A. § 6001(3)(A); Natural Resources Board, Act 250 Rules, Rule 2(A), Code of Vt. Rules 12 004 060 [hereinafter Act 250 Rules].

[8] The Act 250 Rules were amended in 2013. However, because the jurisdictional opinion at issue was requested in 2012, we apply the Rules in effect on that date.

¶ 16. The determination of whether development constitutes a "substantial change" to preexisting development requires a two-part inquiry that asks (1) whether a cognizable physical change to the preexisting development has resulted or may result from the project; and if so, (2) whether the change has a potential for significant impact under one or more of the statutory Act 250 criteria. In re Hale Mountain Fish & Game Club, Inc., 2007 VT 102, ¶ 4, 182 Vt. 606, 939 A.2d 498 (mem.) (citing Sec'y, Vt. Agency of Natural Res. v. Earth Constr., Inc., 165 Vt. 160, 164, 676 A.2d 769, 771 (1996)).

¶ 17. On appeal, Neighbors argue that (1) the Environmental Division erred in considering the entire tract a "preexisting development" encompassing crushing activities, and (2) even if rock-crushing operations generally are part of ROA's preexisting development, the court erred in finding no cognizable change from pre-1970 operations.[9] They challenge the Environmental Division's general approach, which considered evidence of pre-1970 crushing operations anywhere on ROA's 1170-acre tract to establish a preexisting development with respect to crushing operations at the site in dispute. They also contend that the ruling ignores the low threshold this Court has established for establishing a cognizable change.

¶ 18. Our review of the Environmental Division's findings of fact is deferential. The Environmental Division "determines the credibility of witnesses and weighs the persuasive effect of evidence," and "we will not overturn its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous," meaning that there is "no credible evidence to support them." In re Rinkers, Inc., 2011 VT 78, ¶ 8, 190 Vt. 567, 27 A.3d 334 (mem.) (citations omitted). By contrast, we review "issues of law or statutory interpretation de novo." In re Vill. Assocs. Act 250 Land Use Permit, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712 (citation omitted). "We are also mindful, when considering Act 250's jurisdictional

_____

[9] Because the Environmental Division did not make any findings regarding whether the operations had the potential for significant impact under one or more of the Act 250 criteria, in connection with this appeal, we do not consider the proper application of this prong of the "substantial change" analysis to the record evidence.

8

threshold, that 'legislation in derogation of common law property rights will be strictly construed.' " In re CVPS/Verizon Act 250 Land Use Permit, 2009 VT 71, ¶ 14, 186 Vt. 289, 980 A.2d 256 (quoting Comm. to Save Bishop's House, Inc. v. Med. Ctr. Hosp. of Vt., Inc., 137 Vt. 142, 152, 400 A.2d 1015, 1020 (1979) (mem.)). On the other hand, once the threshold for Act 250 jurisdiction is established, exemptions are "to be read narrowly and only applied when the facts clearly support the exemption's application." In re Ochs, 2006 VT 122, ¶ 12, 181 Vt. 541, 915 A.2d 780 (mem.).

A.

¶ 19. We note at the outset that whether NEMG's crushing operations fall within the scope of the preexisting ROA development and whether those operations constitute a substantial change, can arguably be viewed as two sides of the same question. If the scope of ROA's preexisting development encompasses crushing operations on this scale at this site, then the operations cannot be considered a substantial change. On the other hand, if the operations entail a physical change accompanied by a significant potential impact, they are unlikely to be properly considered to be within the scope of the preexisting development.

¶ 20. However, the framing of the question—preexisting development versus substantial change—has an impact on the allocation of the burdens of production and persuasion. We have held that "[g]enerally, the burden of proving that a project is exempt from Act 250 jurisdiction is on the person claiming the exemption." In re Request for Jurisdictional Op. re: Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A (F-35A Case), 2015 VT 41, ¶ 26 n.7, ___ Vt. ___, ___ A.3d ___. On the other hand, where development is grandfathered because it was preexisting, the burden is on the proponent of jurisdiction to demonstrate that the project is a substantial change to the preexisting development. Id.; see also In re Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 10, 181 Vt. 589, 925 A.2d 1006 (mem.).

¶ 21.    With respect to showing substantial change, we have confirmed that the burden of persuasion shifts to the proponent of jurisdiction, F-35A Case, 2015 VT 41, ¶ 26 n.7, but we have not considered what burden of production, if any, remains with the person claiming the exemption.    The former Environmental Board ruled that the person invoking the grandfather exemption retains the burden "to produce information concerning the scope of the pre-1970 operation and the post-1970 operation sufficient for the Board to determine whether a substantial change has occurred."    In re Thomas Howrigan Gravel Extraction, Declaratory Ruling No. 358, slip. op. at 14 (Vt. Envtl. Bd. Aug 30, 1999) (quotationomitted), http://www.nrb.state.vt.us/lup/d ecisions/1999/dr358-fco.pdf.[10]    This Court gives deference to the Environmental Board's interpretation of legislation within its area of expertise.    F-35A Case, 2015 VT 41, ¶ 16 n.3; see also In re Green Crow Corp., 2007 VT 137, ¶ 12, 183 Vt. 33, 944 A.2d 244 (explaining that this Court gives deference to Environmental Board's interpretation of Act 250, "even in appeals raising jurisdictional issues" (quotation omitted)).    Moreover, the Environmental Board's interpretation makes sense, as the owner or operator of the site at issue is the one most likely to have information concerning the historic use of the property.

¶ 22.    Given that different burdens attach, and that the applicable statute distinguishes the preexisting-development exemption from the substantial-change exception to that exemption, 10 V.S.A. § 6081(b), the questions of scope of preexisting development and substantial change, while closely related, cannot actually be one and the same.  Reviewing our past applications of the test, we conclude that the question of whether a proposed development falls within a preexisting development is a more general question; whether the specific parameters of a proposed post-1970 development are consistent with the scope of an established preexisting development is generally analyzed under the substantial-change exception to the grandfather

---

[10]    The Environmental Board no longer exists, and the Superior Court, Environmental Division, now has jurisdiction over appeals concerning the scope of Act 250 jurisdiction. 10 V.S.A. § 6007(d)(4).

10

exemption, rather than as an extension of the threshold preexisting-development analysis. See, e.g., Hale Mountain Fish & Game Club, 2007 VT 102, ¶¶ 4-8 (considering whether various post-1970 development activities at preexisting club constituted substantial change, rather than evaluating whether improvements were within scope of club's preexisting development); Vt. RSA Ltd. P'ship, 2007 VT 23, ¶¶ 8-14 (considering whether installation of antennas on church steeple constituted substantial change, rather than whether the antennas fit within the scope of the church's preexisting development). Accordingly, although NEMG bears the burden of persuasion as to the general existence of the preexisting development, and has the burden of producing information concerning the scope of the pre-1970 operations sufficient for the Board to determine whether a substantial change has occurred, Neighbors in this case bear the burden of persuasion with respect to the substantial-change question.

B.

¶ 23. The Environmental Division's analysis—with respect to both the question of whether the NEMG crushing operations are part of a preexisting development and whether they constitute a substantial change—rested on its view of the parcel as an undifferentiated whole for the purposes of both analyses. In particular, the Environmental Division considered any pre-1970 crushing activity anywhere on the entire 1170 acres owned by ROA as establishing a preexisting development including rock-crushing activities, and as establishing a baseline of rock crushing such that new rock-crushing facilities or operations anywhere on the tract would not constitute a substantial change. Under this view, the absence of prior crushing activity in the vicinity of NEMG's crushing operations would be irrelevant, because previous rock crushing elsewhere on ROA lands, even miles away, could establish a baseline against which NEMG's operations would be measured in the substantial-change analysis, even if the impacts of the past and current crushing operations vary significantly across the tract.

11

¶ 24. Given our above consideration of the more general character of the preexisting-development analysis as compared with the substantial-change determination, we do not take issue with the Environmental Division's broad approach to defining the preexisting development. To the extent that the evidence shows that dimension-stone quarrying was conducted throughout the ROA tract for many decades, and that crushing operations were part of those operations at various sites within the tract at various times through that period, the Environmental Division could conclude that the disputed crushing operations are grandfathered unless Neighbors can show that they constitute a substantial change.[11] But we cannot agree that instances of crushing operations decades ago and miles away from the site of NEMG's present operations can be viewed as establishing some sort of baseline defeating any claim that NEMG's present operations constitute a cognizable change.

¶ 25. We reach this conclusion for several reasons. Most generally, the purpose of Act 250 is to "protect and conserve the lands and environment of the state from the impacts of unplanned and uncontrolled changes in land use." Audet, 2004 VT 30, ¶ 14. We have held that exemptions to Act 250 jurisdiction are "to be read narrowly." Ochs, 2006 VT 122, ¶ 12. The Environmental Division's approach does not read the grandfather exemption narrowly; rather, it opens the door to development related to the dimension-stone-quarrying operations without Act 250 review anywhere on the ROA tract, provided that similar development occurred anywhere on the tract prior to 1970.

¶ 26. Moreover, the focus of Act 250 is regulating the impacts of development—in particular the impacts relating to the statutory Act 250 criteria. See 10 V.S.A. § 6086. We have recognized that this focus on impacts extends to the preexisting-development and substantial-change analyses. See Hale Mountain Fish & Game Club, 2007 VT 102, ¶ 4 (defining "substantial change" as "any change in a development or subdivision which 'may result in

_____

[11] Whether the evidence actually supports such a finding is a distinct question which we consider in Part III, infra.

12

significant impact with respect to any of the [ten] criteria specified' " in 10 V.S.A § 6086(a) (quoting In re Barlow, 160 Vt. 513, 521-22, 631 A.2d 853, 858-59 (1993))). In holding that Act 250 jurisdiction is "not limit[ed] . . . to changes that produce actual impact on the statutory criteria," and that jurisdiction may rest on "potential impacts as long as they are significant," id., we have recognized that the reach of the statutory grandfathering clause is limited when proposed development potentially impacts the statutory criteria. A framework that would cut off the substantial-change analysis at the cognizable-physical-change step—thereby ignoring the actual change in the impact of proposed development at a site simply because similar development had previously occurred at other sites within the tract—is inconsistent with Act 250's focus on discerning the impact of proposed development.[12]

¶ 27. For Act 250 purposes, the location of a particular activity or operation within a tract is often inextricably connected to its impact. For this reason, when reviewing Act 250 permit applications, the district environmental commissions and the Environmental Division routinely engage in impact analysis that is location-specific and evaluates the impacts on particular neighbors or households. See, e.g., In re Lathrop Ltd. P'ship, 2015 VT 49, ¶¶ 74-88 ___ Vt. ___, ___ A.3d ___ (analyzing impact of gravel-extraction operations on neighbors by measuring noise in decibels at the property line); In re Goddard Coll. Conditional Use, 2014 VT 124, ___ Vt. ___, 111 A.3d 1285 (considering challenge to permit issued for woodchip-boiler plant based on its siting within the owner's tract); see also In re R.E. Tucker, Inc., 149 Vt. 551, 557-58, 547 A.2d 1314, 1318-19 (1988) (approving of condition in land-use permit placing limitations on where gravel crusher could be located within tract because severity of noise pollution depended on placement). A manufacturing operation that may be permitted on one end of an applicant's property might not be permitted on the other in light of the operation's impacts

---

[12] Although the Environmental Division made no findings concerning the relative impact on Neighbors of NEMG's operations as compared to the pre-1970 impacts, it specifically found that as a result of the crushing operation, Neighbors experience noise from material being loaded or unloaded; dust on house windows, outside furniture, lawns, and cars; and dump-truck traffic.

13

on neighboring landowners, and permits are frequently issued with conditions and requirements mitigating the impact of particular development. See 10 V.S.A. § 6086(c) (permits may be issued with conditions relating to statutory criteria).

¶ 28. For these reasons, in the context of a straightforward Act 250 permit application, it is almost inconceivable that a dimension-stone quarry with neighbors nearby could obtain an open-ended permit to install a crusher at any location on its property that it chooses, with no requirement to mitigate its impact on neighboring landowners. Given that, a legal framework that treats crushing operations in one location as establishing a grandfathered right to crushing operations in any location on the tract is incongruous. This is true even in the face of a pre-1970 history of intermittent crushing at two or three different locations on an 1170-acre tract.

¶ 29. The broad, tract-wide approach to assessing cognizable change that the Environmental Division followed is also at odds with this Court's, and the Environmental Board's, historical treatment of gravel pits in cases that present analogous issues. We recognize that "gravel, quarry and mining operations do present unique realities because, unlike other developments, they will by their nature gradually expand to occupy a larger and larger area." In re Weston Island Ventures, Declaratory Ruling No. 169, slip op. at 6 (Vt. Envtl. Bd. June 3, 1985), http://www.nrb.state.vt.us/lup/decisions/1985/dr169.pdf. But the gradual expansion or shifting of operations intrinsic to quarrying does not mean that changes in quarrying operations are never cognizable. Nearly forty years ago, the Environmental Board enumerated four factors that can support a finding of a cognizable change in the context of a gravel-pit expansion:

1. Acquisition of and removal of gravel on additional land;

2. Opening a new area a substantial distance from the pre-existing area;

3. Changing the nature of the operation as might occur by the addition of a stone crusher; or

14

> 4. Removal of gravel . . . across a public highway, where it might be argued that the intervening ownership defined the limits of the pre-existing operation.

In re Clifford's Loam & Gravel, Inc., Declaratory Ruling No. 90, slip op. at 3 (Vt. Envtl. Bd. Nov. 6, 1978).

¶ 30. Consistent with this guidance, although the Environmental Board consistently recognized that gradual expansion within a preexisting quarry tract is not a cognizable change, it consistently treated new quarrying operations at a different site within a gravel extraction operation as a change. See e.g., Weston Island Ventures, slip op. at 5 (noting, in finding substantial change in gravel-extraction operation, that although "substantial gravel extraction operations took place prior to 1970 in two different areas . . . south of Route 100, the pre-existence of those pits does not extend north of Route 100," and that "[e]ven if the Board were to find that the [pit north of Route 100] was opened prior to 1970 and operated continuously after that date, an Act 250 permit would be required because [operator] has introduced several changes to that pit," including "operation of a crusher" and "a three-fold increase in the annual volume of extraction," causing "potential impacts").[13] The Environmental Board also recognized that an increase in crushing operations can trigger a cognizable and substantial change. See In re L.W. Haynes, Inc., Declaratory Ruling No. 192, slip op. at 4-7 (Vt. Envtl. Bd. Sept. 25, 1987), http://www.nrb.state.vt.us/lup/decisions/1987/dr192-fco.pdf (concluding that gravel-pit operation had undergone cognizable change with significant impact where pit went "from a part-time operation with no permanent crusher to a full-time operation with a permanent

---

[13] See also In re F.W. Whitcomb Constr. Co., Declaratory Ruling No. 408, slip op. at 3 (Vt. Envtl. Bd. Aug. 28, 2002), http://www.nrb.state.vt.us/lup/decisions/2002/dr408-mod.pdf ("The general rule is that gradual expansion within a preexisting quarry tract is not a cognizable change. . . . However, this does not mean that there can never be a cognizable physical change when there is gradual expansion within a preexisting quarry tract. Such gradual expansions may entail other changes which are cognizable physical changes."); Thomas Howrigan Gravel Extraction, slip op. at 14-15 (determining that six gravel-pit sites on same tract were "separate and distinct pits that must be analyzed separately," even if all pits shared same gravel deposit and there was evidence of preexisting use of many of them, because some were separated from other pits by road and meadow at great distance).

15

crusher," substantially increased its annual extraction rates, and made various improvements, resulting in increased dust, noise, and truck traffic in local area). The issues in these gravel-pit expansion cases are not identical to the issue before us in this case. However, the Environmental Board's analysis in these cases supports our conclusion that some level of granularity (rather than a uniform "tract-wide" approach) is required in assessing substantial change in connection with quarrying operations. Pre-1970 crushing operations on one or more parts of a large tract cannot simply be imputed to all parts of that tract for the purposes of a substantial-change analysis, without regard to the relative impacts of the pre- and post-1970 operations in the vicinity of the proposed change.[14]

¶ 31.   Finally, the Environmental Division's reliance on a "no cognizable physical change" rationale is inconsistent with a string of cases treating even relatively modest changes as cognizable changes. See, e.g., Vt. RSA Ltd., 2007 VT 23, ¶ 11 (affirming Environmental Board's finding that installation of antennas within church's existing bell towers was a cognizable physical change, even though they had no significant aesthetic impact on area); In re

---

[14] We do not mean to suggest that in evaluating proposed operations at a particular site in the ROA tract, the district environmental commission cannot consider whether similar operations took place prior to 1970 at a different site within the same tract. Neighbors argue that because the present-day ROA site is an amalgamation of several constituent quarries (historically under independent ownership from each other), some of which are separated by public roads and several miles distant from each other, "they are distinct developments and therefore crushing on one does not establish crushing on the other." The Environmental Division declined to distinguish between different parts of the same tract based on distance or intervening public roads. We conclude that factors such as distance between sites and separation by a public highway affect the weight to be given to the fact of pre-1970 operations at another site within a tract. See Clifford's Loam & Gravel, slip op. at 3. But we do not adopt a bright-line rule precluding any consideration of pre-1970 activities at formerly independently owned quarries in connection with post-1970 proposed development.

The dissent suggests that undermines our analysis. Post, ¶¶ 46-47. We do not see how. Clifford's Loam & Gravel distinguishes between the gradual expansion of existing operations intrinsic to gravel quarrying and the creation of new pits or the commencement of new, noncontiguous operations on a different site within a tract. The circumstance here—the introduction of significant crushing operations on a site not known to have had similar operations for over fifty years—is more closely analogous to the introduction of new operations on a different site within a gravel extraction tract than to the gradual expansion of existing operations.

Gallagher, 150 Vt. 50, 52-53, 549 A.2d 637, 639 (1988) (reversing determination that proposal, which did not include physical changes to property, was not cognizable because proposal might nonetheless result in material or substantial change).[15] The deployment of heavy industrial equipment that qualifies as development in a vicinity where it has not previously been deployed is a cognizable change.[16] We accordingly reverse the Environmental Division's conclusion that the challenged rock-crushing activity is not a cognizable change. Whether the development gives rise to potential significant impact with respect to one or more of the Act 250 criteria remains to be seen.[17]

III.

---

[15] See also In re Lake Champagne Campground, Declaratory Ruling No. 366, slip op. at 16-17 (Vt. Envtl. Bd. Mar. 22, 2001), http://www.nrb.state.vt.us/lup/decisions/2001/dr377-fco.pdf (change in winter-storage location of camper units was "cognizable physical change" to campground, and thus met first prong of substantial-change test, even when there were fewer camper units at site post-1970 than pre-1970); In re Dev.'s Diversified Realty Corp., Declaratory Rulings Nos. 364, 371 & 375 (consolidated), slip op. at 17-18 (Vt. Envtl. Bd. Mar. 25, 1999), http://www.nrb.state.vt.us/lup/decisions/1999/dr364-fco.pdf (exterior storefront changes such as new double doors, ramps, and bollards, were cognizable physical changes); In re Vt. Agency of Transp. (Rte. 73), Declaratory Ruling No. 298, slip op. at 2-3 (Vt. Envtl. Bd. May 9, 1995), http://www.nrb.state.vt.us/lup/decisions/1995/dr298-fco.txt (replacement of wood-post guardrail with steel-beam guardrail along five-mile stretch of state highway was cognizable change).

[16] In reaching this conclusion, we are not, as the dissent suggests, "collapsing" the two prongs of the substantial-change test into one. Post, ¶¶ 37, 43. Nor do we hold that the rock-crushing activity in question cannot be grandfathered unless ROA "can demonstrate a history of equivalent crushing activities at the exact proposed site." Post, ¶ 37. These characterizations overstate our holding. Even if the introduction of rock-crushing machinery and activities to the site in question is a cognizable physical change, the development will be grandfathered unless neighbors can show that the activities may result in a significant adverse impact with respect to the Act 250 criteria.

[17] The Environmental Division also relied heavily on its conclusion that rock crushing is part and parcel of dimension-stone quarrying in reaching its conclusion that the crushing operation at issue here does not give rise to a cognizable change. The dissent likewise invokes generalizations about the relationship between rock-crushing activities and dimension-stone quarrying. Post, ¶¶ 38, 47. Whether crushing is best characterized as "integral to" or "ancillary to" dimension-stone quarrying is beside the point. Whether the crushing operations at issue here constitute a substantial change from the pre-1970 ROA dimension-stone quarry development turns on the actual existence, relative location, and relative amount of pre-1970 crushing, and the consequent impact of the new crushing on the Act 250 criteria. It does not turn on a general abstract conception of the relationship between dimension-stone quarrying and rock crushing.

17

¶ 32. The above analysis focuses on a legal question—whether the Environmental Division used the right framework in evaluating the challenged crushing operations under 10 V.S.A. § 6086(b). As Neighbors argue, the Environmental Division's analysis suffers from a significant evidentiary flaw as well. In assessing the scope of ROA's preexisting development as it relates to rock crushing, the question of whether the preexisting development was abandoned, and the question of whether NEMG's operations constitute a cognizable change, the Environmental Division rested heavily on its finding that dimension-stone-quarrying operations on the ROA tract have included intermittent crushing operations at various locations within ROA from 1904 through to present times.

¶ 33. This finding was, in turn, based on several specific findings concerning rock-crushing activities on the tract. In particular, the Environmental Division found that there was crushing activity of unspecified amount or duration near the site of NEMG's current crushing operations around 1912; that the Wells-Lamson Quarry Co. conducted crushing of an unspecified amount and unspecified frequency, including an operation producing poultry grit and road aggregate, as far back as 1926 through the 1960s; that Wells-Lamson's crushing operation provided granite sub-base for Interstate 89 in 1958 and 1959 (in amounts detailed in the Environmental Division's opinion); and that Kelley Construction Co. contracted with ROA to crush approximately 30,000 cubic yards of material for sale between September 1969 and April 1970. In its discussion, the Environmental Division leaned most heavily on the evidence concerning crushing operations to provide sub-base material for I-89.

¶ 34. ROA concedes that this category of crushing activity—crushing to provide sub-base for I-89—has not been linked to the ROA tract. In fact, the evidence suggests that the I-89-related crushing occurred on property that has never been part of the ROA tract. For that reason, the Environmental Division erred in relying on this evidence in determining the scope of the preexisting development. We will overturn the Environmental Division's factual findings if they

18

are clearly erroneous. <u>Rinkers</u>, 2011 VT 78, ¶ 8. Without consideration of this off-site crushing, we are left with the findings that crushing in an unspecified amount occurred near the site currently at issue around 1912; that Wells-Lamson crushed an unspecified amount of rock at an unspecified frequency from 1926 to 1960; and that a contractor contracted with ROA to crush approximately 30,000 cubic yards of material during an eight-month period in 1969 and 1970. The sparseness of these subsidiary findings, especially when we set aside those findings relating to the off-site crushing, does not match the breadth of the Environmental Division's conclusion that intermittent crushing, presumably in an amount commensurate with the crushing at issue in this case, characterized ROA's operations for over a century. While the evidence might support more robust findings than those made, the findings made by the Environmental Division do not establish the amount and frequency of the pre-1970 crushing sufficient to support the Environmental Division's broader conclusion. See <u>Thomas Howrigan Gravel Extraction</u>, slip op. at 14 (noting that party invoking grandfather exemption has burden "to produce information concerning the scope of the pre-1970 operation and the post-1970 operation sufficient for the Board to determine whether a substantial change has occurred" (quotation omitted)).

¶ 35. Thus, we reverse the Environmental Division's findings concerning the scope of rock-crushing activities in the preexisting development and the absence of abandonment. We remand for consideration in light of the record evidence of pre-1970 rock-crushing operations on the ROA tract.

¶ 36. On remand, in light of this opinion and the record evidence, the Environmental Division should revisit its findings concerning whether NEMG's rock-crushing operations fit within the general scope of ROA's pre-1970 development; whether the rock-crushing operations, if established as part of the pre-1970 development, were abandoned; and whether, if the preexisting development does include rock-crushing operations generally, NEMG's operations in this case give rise to a substantial change, analyzed consistent with the guidance set forth above.

19

<u>Reversed and remanded for further proceedings consistent with this opinion</u>.

FOR THE COURT:

_____

Associate Justice


¶ 37.   **EATON, J., dissenting**.   Since 2008, at least three different district coordinators of the District 5 Environmental Commission following site visits, and then the Superior Court, Environmental Division, following a two-day de novo hearing, have concluded that rock-crushing activities by North East Materials Group LLC (NEMG) within the longstanding Rock of Ages Corporation (ROA) industrial dimension-stone quarry complex[18] do not constitute a substantial change from quarry operations that preexisted Act 250, and thus are exempt from the Act.  As longtime district coordinator Edward Stanak stated in a November 2010 jurisdictional opinion concluding that no permit was required for proposed rock-crushing within the ROA tract: "Essential to this conclusion is the understanding that the extraction and processing sites are within the interior of the overall Rock of Ages industrialized setting."  Notwithstanding the consensus on this issue from those with specialized expertise in the Act 250 permitting process, and the ample evidence presented in the Environmental Division supporting this position, the majority holds that ROA cannot retain exempt status for mobile rock-crushing operations wholly within its industrial complex unless it can demonstrate a history of equivalent crushing activities at the exact proposed site.  The majority arrives at this holding by effectively collapsing the bifurcated two-part substantial-change test into a single analysis and placing upon NEMG the burden of proving that the proposed rock crushing is not a substantial change to its grandfathered

---

[18]  The Environmental Division found that the ROA quarrying operation is comprised of several smaller individual quarries that have been active from the late 1800s to the present. Donald C. Murray, an engineer who has worked for ROA since 1979, provided uncontested testimony that ROA has existed in its present form with the aggregated quarries since the mid-1940s.

20

development. In my view, both the law and the facts support the Environmental Division's determination that mobile rock crushing at the proposed level within the ROA industrial complex is an exempt preexisting development that cannot be considered a cognizable change from what has occurred within the complex since well before Act 250 became law. I cannot join the majority's opinion, which would effectively require a new or amended Act 250 permit every time ROA moved its crushing activities from one site to another within the industrial complex. Accordingly, I respectfully dissent.

¶ 38. Before examining the relevant law, I emphasize some of the critical unchallenged findings made by the Environmental Division. Rock crushing is a common activity at dimension-stone quarries such as ROA that utilize waste material resulting from the extraction process. As the court found, rock crushing "at various locations [within a quarry operation] is customary in the industry because the equipment is often portable and the source of material may change." Moreover, the court found that "[i]ntermittent rock crushing is also customary based on waste material levels and demand for crushed rock." These findings are supported by the testimony of Donald Murray, who, when asked whether a stone quarry could be run without stone crushing, responded that it was "possible if you've got the acreage and the money [to deposit the uncrushed waste material] but the development process is extremely expensive and if you can offset some of those costs [by selling crushed waste material], obviously it helps your bottom line." Mr. Murray testified not only that rock crushing was "very common" at stone quarries in general but also that he had "personal knowledge" of rock crushing occurring at ROA since the 1960s. He further testified that the amount currently being crushed at the contested site was "much less" than the amount that had been done by previous companies in the past. In short, the court's undisputed findings demonstrated that intermittent and mobile rock crushing is standard operating procedure at stone quarries and in fact has been going on within the ROA

21

industrial complex for over one hundred years. Cf. 10 V.S.A. § 6081(k)(1) (defining "[a]ncillary activities" of slate quarry to include "crushing").

¶ 39. In recounting the history of rock crushing at ROA, the Environmental Division relied not only on Mr. Murray's personal knowledge of rock crushing there since the 1960s but also his "significant research into crushing activities at ROA preceding 1960." Indeed, that research was the subject of several exhibits and multiple court findings regarding rock-crushing activities on the ROA tract from the early twentieth century until the present day. As the court noted, photographs from the first decade of the twentieth century showed a large crushing plant and a rock crusher located extremely close to the site of the crusher that is the subject of the instant dispute. The court found that another company conducted rock crushing within the tract as early as the mid-1920s and that "the crushing continued through the 1940s and into the 1960s." The court also found that another company contracted for crushing a significant amount of material from the fall of 1969 into the spring of 1970.

¶ 40. Neither Neighbors nor the majority dispute these findings, but rather attack another finding in which the court described significant crushing activities that occurred in the late 1960s and produced materials for I-89. Because those particular crushing activities apparently occurred just outside the ROA tract, the majority concludes that this finding cannot support the court's ultimate finding that intermittent but regular crushing activities have occurred within the ROA tract for over a century. I disagree. Even discounting the Environmental Division's two findings that concern crushing activities just outside the ROA tract, its remaining findings fully support its conclusion that regular but intermittent rock crushing has occurred at several locations within the ROA tract as an integral part of the grandfathered quarrying operation for over a century.

¶ 41. With these facts in mind, I examine the relevant law. As the majority points out, the burden of proving that a development is exempt from Act 250 because it preexisted the law

and has not been abandoned is on the party claiming the exemption. See In re Request for Jurisdictional Op. re: Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A (F-35A Case), 2015 VT 41, ¶ 26 n.7, ___ Vt. ___, ___ A.3d ___. That burden, however, "shifts to the proponents of jurisdiction to demonstrate that the project represents a substantial change to the preexisting development." In re Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 10, 181 Vt. 589, 925 A.2d 1006 (mem.). With regard to this latter burden, the majority adopts the requirement of the former Environmental Board that the party seeking the exemption "produce information concerning the scope of the pre-1970 operation and the post-1970 operation sufficient . . . to determine whether a substantial change has occurred." In re Thomas Howrigan Gravel Extraction, Declaratory Ruling No. 358, slip op. at 14 (Vt. Envtl. Bd. Aug. 30, 1999) (quotation omitted), http://www.nrb.state.vt.us/lup/decisions/1999/dr358-fco.pdf.

¶ 42. I agree that it makes sense for the proponent of the exemption, as the party in possession of any information on the scope of the development over the years, to make that information available, but I would emphasize that the burden of persuading the trier of fact that a substantial change has occurred remains with the party contesting the grandfathered exemption. See id. ("However, the burden of persuasion with respect to substantial change lies with those who contend that a permit is required." (quotation omitted)). In my view, the reasoning underlying the majority's reversal of the Environmental Division's decision effectively places that burden on ROA rather than Neighbors.

¶ 43. Moreover, the majority skews the longstanding two-prong substantial-change test by collapsing the test into a single analysis. Early on, this Court adopted the Environmental Board's two-part substantial-change test, under which Act 250 jurisdiction may be invoked under the following circumstances: "First, the Board must find a cognizable physical change to the pre-existing development. If such a change is found, the Board must conclude that the change has caused a significant impact under one or more of the ten criteria listed in § 6086 of

23

Act 250." In re H.A. Manosh Corp., 147 Vt. 367, 370, 518 A.2d 18, 20 (1986); see In re Barlow, 160 Vt. 513, 521, 631 A.2d 853, 858 (1993) (concluding that Board's rule adopting two-part substantial-change test "has effectively become part of the Act 250 legislative scheme" and thus has same effect as any law passed by Legislature).

¶ 44. Accordingly, over the years, both the Board and this Court have consistently addressed each prong of the two-prong test separately, reaching the second prong only if the first prong is met. See, e.g., Vt. RSA Ltd. P'ship, 2007 VT 23, ¶¶ 10-11 (noting that Board went on to analyze potential for significant impacts after finding that cognizable-change prong had been met); In re F.W. Whitcomb Constr. Co., Declaratory Ruling No. 408, slip op. at 11 (Vt. Envtl. Bd. Aug. 28, 2002), http://www.nrb.state.vt.us/lup/decisions/2002/dr408-mod.pdf ("Because the Board finds no cognizable physical change, the Board does not go on to determine whether any change has the potential for significant impact under any Act 250 criterion.").

¶ 45. Of the four reasons the majority proffers to support its holding that evidence of past crushing activities within an exempt industrial complex must be site-specific to retain a grandfathered exemption, the one to which the majority devotes the most attention is the notion that we must focus on the impacts of the development because Act 250 is concerned with environmental impacts.[19] Notwithstanding that the majority purports not to reach the second prong of the substantial-change test concerning the potential impacts of a cognizable change, this

---

[19] The other three reasons the majority proffers are that: (1) Act 250 exemptions should be read narrowly; (2) the Environmental Division's tract-wide approach to assessing substantial changes is at odds with our historical treatment of gravel-pit cases; and (3) the Environmental Division's conclusion that there is no cognizable physical change to the ROA development is inconsistent with past cases in which this Court has found even relatively modest changes to be cognizable changes that satisfy the first prong of the substantial-change test. Regarding the first reason, the majority itself acknowledges an equally important general principle that this Court must be "mindful, when considering Act 250's jurisdictional threshold, that legislation in derogation of common law property rights will be strictly construed." In re CVPS/Verizon Act 250 Land Use Permit, 2009 VT 71, ¶ 14, 186 Vt. 289, 980 A.2d 256 (quotation omitted). Regarding the other two reasons, as discussed below, I believe that the Environmental Division's decision is consistent with the relevant law.

reasoning is inconsistent with the Environmental Board decisions it relies on requiring that the first prong of the substantial-change test be met before any impacts are considered.

¶ 46. In re Clifford's Loam & Gravel, Inc., Declaratory Ruling No. 90 (Vt. Envtl. Bd. Nov. 6, 1978), perhaps the earliest Board decision discussing the two-part substantial-change test, is a decision on which the majority relies heavily but that cuts against the majority's reasoning and its ultimate holding. In that decision, the Board found that the gravel operation at issue, "although more visible and apparently having greater environmental impacts, is not materially different from the pre-1970 operation." In its conclusions of law, the Board explained the legal effect of this finding:

> The pre-existing gravel operation has not been changed even though it is apparent that the gradual expansion of the directly and visibly involved area is causing greater environmental impacts. The nature of such an operation is to continue to expand the area from which gravel has been removed. Criterion 9(E) and references in the statement of legislative intent set forth in Act 250 indicate that special importance was placed on extraction of earth resources by the Vermont General Assembly.

> In accordance with the Board's understanding of Act 250 and the legislative intent, we conclude that when a gravel operation commenced prior to Act 250 is expanded and operated in essentially the same manner as it was prior to Act 250, that only a substantial change in operation can trigger Act 250 jurisdiction. The fact that existing impacts including noise, dust, and traffic will be increased as the operation expands is not the controlling factor with respect to Act 250 jurisdiction.

Id. slip op. at 2-3 (concluding that because no change in operation occurred "there is no basis for holding further hearings to evaluate potential environmental impacts").

¶ 47. In later decisions, the Board consistently reinforced this position. Indeed, in another decision relied on by the majority, the Board cited factors set forth in Clifford's Loam & Gravel for determining whether a cognizable change had occurred, but emphasized "that contiguous expansion of the excavation area within the pre-existing tract is not a change, provided that the excavation operation is expanded and operated in essentially the same manner

25

as it was before June 1, 1970." Howrigan Gravel Extraction, slip op. at 18 (quotation omitted); see also In re Dale E. Percy, Inc., Declaratory Ruling No. 251, slip op. at 5 (Vt. Envtl. Bd. Mar. 26, 1992), http://www.nrb.state.vt.us/lup/decisions/1992/dr251-fco.pdf ("The Board has previously ruled that contiguous expansion of the excavation area within the pre-existing tract is not a change, provided that the excavation operation is expanded and operated in essentially the same manner as it was before June 1, 1970."); In re Weston Island Ventures, Declaratory Ruling No. 169, slip op. at 6 (Vt. Envtl. Bd. June 3, 1985), http://www.nrb.state.vt.us/lup/decisions/1985/dr169.pdf (agreeing "that gravel, quarry and mining operations do present unique realities, because unlike other developments, they will by their nature gradually expand to occupy a larger and larger area").

¶ 48.   In this case, as noted, the Environmental Division made unchallenged findings that rock crushing is a normal part of a dimension-stone quarrying operation and is customarily done in various locations within the operation because the equipment is often portable and the source of materials to be crushed changes.  Moreover, as described above, NEMG presented ample evidence through the testimony of a longstanding employee and a multitude of exhibits that rock crushing has been going on as part of quarry operations for over a century within the contiguous tract of land it has owned for forty years.

¶ 49.   Given the evidence presented by NEMG and the Environmental Division's undisputed findings, there can be little doubt as to the existence of exempt intermittent rock-crushing activities within the ROA industrial complex that have always been part and parcel to the quarrying operations and that have never been abandoned.  See In re Vill. Assocs. Act 250 Land Use Permit, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712 ("Under our standard of review, the Environmental Court determines the credibility of witnesses and weighs the persuasive effect of evidence, and we will not overturn its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." (quotation omitted)); In re R.E.

26

<u>Tucker, Inc.</u>, 149 Vt. 551, 557, 547 A.2d 1314, 1318 (1988) ("Where findings of the Board with respect to questions of fact are supported by substantial evidence on the record, they are conclusive."); cf. <u>In re Orzel</u>, 145 Vt. 355, 359, 491 A.2d 1013, 1015 (1985) (concluding that commercial gravel operation preexisted Act 250 where findings indicated that gravel was removed intermittently and no evidence indicated abandonment of those intermittent activities); <u>Howrigan Gravel Extraction</u>, slip op. at 16 (finding preexisting gravel operation grandfathered and no abandonment at pit where extraction "occurred on a very limited basis"); <u>In re Champlain Marble Corp.</u>, Declaratory Ruling No. 319, slip op. at 7 (Vt. Envtl. Bd. Oct. 2, 1996) (concluding that stone removal activity had not been abandoned despite "sporadic" activity and "minimal evidence" of ongoing extraction activity at time Act 250 was enacted).

¶ 50.    The only real question is whether a permit is needed because the rock-crushing activities have moved to different locations within the ROA industrial complex.  The majority cites the four guidelines set forth in <u>Clifford's Loam & Gravel</u> for determining whether there has been a substantial change to gravel operations: (1) removing gravel on additional land; (2) opening a new area a substantial distance from the preexisting area; (3) changing the nature of the operation, for example by adding a stone crusher; or (4) removing gravel across a waterway or public highway "where it might be argued that the intervening ownership defined the limits of the pre-existing operation." Id. slip op. at 3.  Of course, this is not a gravel-crushing case.  As the Environmental Division reasonably concluded, the gravel cases are not entirely analogous to the instant case because they involve continual extraction along a contiguous line. In a gravel operation, as opposed to a dimension-stone operation, the gravel itself is the principal product being extracted.  In a dimension-stone operation, the loose stone, or grout, is a by-product of the exempted granite extraction.  As the Environmental Division pointed out, gravel cases in which the Board ruled that a permit was needed because the challenged gravel extraction was taking place in an entirely new area are not analogous to the situation here, where mobile

27

rock-crushing activities have been moved to various quarry locations within the ROA industrial complex.

¶ 51.   To the extent that the Clifford's Loam & Gravel guidelines are analogous to this case, they do not support the majority's holding.  Rock crushing at the ROA site, as is typical of the dimension-stone quarry industry, is an ancillary activity that has been done intermittently during the last century at various locations within the industrial complex, including near the contested rock-crushing site.  Thus, the instant situation does not involve opening up a new area or commencing the development on additional land.

¶ 52.   Nor does it involve either a change in the development or an extraction of materials across a waterway or highway beyond what might be considered "the limits of the pre-existing operation."   Indeed, the cases finding cognizable changes in comparable large-scale gravel operations have involved an expansion of those operations not present here.  Cf. In re Barlow, 160 Vt. at 517, 631 A.2d at 856 (noting that Board found cognizable changes in rate and frequency of gravel extraction and use of "portable stone crusher where none had been used before"); In re Haynes, 150 Vt. 572, 573, 556 A.2d 77, 78 (1988) (noting that Board found increased level of gravel extraction as well as establishment of continual operations, installation of permanent crusher, placement of an office and shop on property, and installation of two fuel tanks); In re R.E. Tucker, Inc., 149 Vt. at 553, 547 A.2d at 1315-16 (noting that Board found "installation of new equipment, a new roadway and excavation of settling lagoons, together with the withdrawal of water from the Dog River"); In re H.A. Manosh Corp., 147 Vt. at 369, 518 A.2d at 19 (noting that Board found "significantly expanded" gravel operation involving "the introduction of mechanized equipment constitut[ing] a cognizable physical change to the pre-existing development"); In re L.W. Haynes, Inc., Declaratory Ruling No. 192, slip op. at 7 (Vt. Envtl. Bd. Sept. 25, 1987), http://www.nrb.state.vt.us/lup/decisions/1987/dr192.pdf (concluding that cognizable-change prong of substantial-change test had been met by conversion of gravel pit

to full-time operation, installation of crusher on permanent basis, installation of gate, doubling of width of access road, installation of office trailer, and increase in gravel extraction); Weston Island Ventures, Declaratory Ruling No. 169, at 5 (stating that permit for gravel operation would be required even assuming it preexisted Act 250 because of construction of new access road, installation of mobile home, operation of crusher, and three-fold increase in extraction).[20]

¶ 53.     According to the majority, it is "inconceivable" that a stone quarry such as ROA "could obtain an open-ended permit to install a crusher at any location on its property that it chooses," and thus it would be "incongruous" to adopt "a legal framework that treats crushing operations in one location as establishing a grandfathered right to crushing operations in any location on the tract." Ante, ¶ 28. Once again, this reasoning demonstrates the majority's failure to separate out the first prong of the established two-prong substantial-change test. As noted, the first prong of that test focuses on whether the development is being operated in essentially the same manner as it was prior to Act 250, irrespective of whether a permit would be needed for that same development. This is not a request for an original or amended permit. Rather, NEMG had the burden to demonstrate only that the challenged activity was preexisting and ongoing and to provide information from which the factfinder could determine that no substantial change had occurred. NEMG met that burden, and thus Neighbors bore the burden to persuade the Environmental Division first and foremost that a cognizable change had occurred, irrespective of

[20] The majority cites two cases from this Court in support of its assertion that even modest physical changes are treated as cognizable changes that satisfy the first prong of the substantial-change test. One case involved the addition of antennas on a church, see Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 11, while the other involved the conversion of cabins into condominiums without any physical changes, In re Gallagher, 150 Vt. 50, 51, 549 A.2d 637, 638 (1988). Neither case involved any challenge regarding the first prong of the substantial-change test. In the first case, this Court rejected the neighbors challenge to the Board's substantial-change analysis under criteria 8 and 10 of Act 250, Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 14, while in the second case, which did not even involve a grandfathered exemption, we reversed the Board's ruling because the Board failed to give the parties an opportunity to present evidence on whether the proposed condominium conversion would amount to a "material" or "substantial" change requiring an amended permit, Gallagher, 150 Vt. at 53, 549 A.2d at 639. In any event, neither case has factual circumstances even remotely similar to those here involving an expansive quarry complex.

any impacts resulting from the preexisting development. As the Board stated in <u>Clifford's Loam & Gravel</u>:

> Act 250 jurisdiction cannot be asserted simply because existing environmental impacts are increased even though the impacts could have been reduced or avoided. While criterion 9(E) makes it very unlikely that some of the present practices by Clifford's would be allowed if Act 250 jurisdiction did apply, this ruling must be limited to a determination of whether or not an Act 250 permit is required. Unless applicable law and precedents create jurisdiction, there is no purpose served by evaluating the manner of the operation even if a "reasonable man" would find that operation environmentally objectionable.

Slip op. at 3.

¶ 54. The Environmental Division, as did several district coordinators, recognized that the overall nature of the preexisting development in this case is an expansive stone quarry that involves—and for over a century has always involved—intermittent rock crushing as an ancillary activity. The ROA industrial complex is contiguous, and the rock-crushing operations there have historically moved from one area of the complex to another depending on the source of the stone to be crushed. Because crushing has always been part and parcel to the contiguous stone-quarrying operations in the complex, there is no cognizable change to the preexisting development. This is the reasonable rationale of the Environmental Division and the several district coordinators in rejecting Act 250 jurisdiction for the rock-crushing activities. In my view, the law and common sense support this position.

¶ 55. I am authorized to state that Justice Skoglund joins this dissent.

_____
Associate Justice