STATE OF VERMONT

SUPERIOR COURT
Vermont Unit

ENVIRONMENTAL DIVISION
Docket No. 143-10-12 Vtec

N.E. Materials Group LLC A250 JO #5-21

DECISION ON THE MERITS

This matter is comes to the Court on remand from the Vermont Supreme Court's decision in In re N.E. Materials Grp. Act 250 JO, 2015 VT 79.  In our original decision, thirteen citizens, collectively "Neighbors for Healthy Communities" (Appellants), appealed a September 28, 2012 jurisdictional opinion of the District 5 Environmental Commission Coordinator (District Coordinator), which determined that North East Materials Group, LLC's (NEMG) rock crushing operations, located at the Rock of Ages (ROA) quarry in the Town of Barre, Vermont,[1] did not require an Act 250 permit.[2]  NEMG argued that its rock crusher was part of a preexisting development and therefore exempt from Act 250 jurisdiction.  See 10 V.S.A. § 6081(b). Appellants argued that NEMG's rock crushing operation constituted a "substantial change" to NEMG's preexisting quarry activities and was therefore subject to Act 250 jurisdiction.  See id. We held that NEMG's rock crusher was not a substantial change to ROA's preexisting quarry operation, and therefore not subject to Act 250 jurisdiction.  In re N.E. Materials Grp. LLC A250 JO #5-21, No. 143-10-12 Vtec, slip op. at 14–15 (Vt. Super. Ct. Envtl. Div. Apr. 28, 2014) (Walsh, J.).  The Supreme Court reversed and remanded to this Court.  2015 VT 79, ¶ 36.

On remand, this Court afforded the parties an opportunity to introduce new evidence. The parties declined the opportunity to reopen the trial and offer additional evidence; however, they did file post-remand briefs offering different ways of interpreting the Supreme Court's remand decision.  The Court therefore revisits the existing record in the case and renders the following findings of fact and conclusions of law.  The factual findings include all

---

[1] Although this appeal is captioned "In re North East Materials Group, LLC," the Rock of Ages Corporation, the owner and operator of the Rock of Ages quarry, is also an appellee.

[2] A thorough procedural history of the case is provided in our original decision on the merits.  See In re N.E. Materials Grp. LLC A250 JO, No. 143-10-12 Vtec, slip op. at 1–3 (Vt. Super. Ct. Envtl. Div. Apr. 28, 2014) (Walsh, J.).

unchallenged findings from our first decision.[3] We have stricken findings regarding the northernmost Wells-Lamson rock crushing facility (which provided a sub-base for I-89), since the northernmost Wells-Lamson parcel was never aggregated onto the ROA tract. See id. ¶ 34. We supplement our findings with several facts (all indicated "added on remand") to help clarify the relative locations of the different historical crushing sites on the ROA tract. We have also added more detailed findings regarding the impacts of crushing on the neighbors. All of the findings have been put into context by the site visit the Court conducted on December 4, 2013, at which Alan Biederman and James Goss, attorneys for Applicant, and Christopher Ahlers and Douglas Ruley, attorneys for Appellants, were present.[4]

## Findings of Fact

1.    NEMG operates a rock crusher on large tract of land owned by the Rock of Ages Corporation. (Added on remand).

2.    The Rock of Ages Corporation is a quarrying operation comprised of several smaller individual quarries active from the late 1800s to current times, now all aggregated as a single parcel under the Rock of Ages Corporation ownership and operation.

3.    All total, ROA comprises approximately 930 acres in Barre, Vermont and 230 acres in Williamstown, Vermont.

4.    Some of the historic individual quarries were previously owned and operated by the Boutwell, Milne & Varnum Corporation, the E.L. Smith & Company, the Wetmore & Morse Granite Company, and the Wells-Lamson quarry Company.

5.    The NEMG crusher is located on what was historically the Boutwell, Milne & Varnum Corporation quarry. (Added on remand).

6.    These quarries are adjacent to one another and are aligned in a more or less north-south configuration.

---

[3] We have made minor stylistic alterations to some of our original findings, but the original findings remain substantively unchanged unless otherwise noted.

[4] Attorney Ruley has withdrawn from this appeal as of December 21, 2015. Laura Murphy is now lead counsel for Appellants.

7.      The northernmost historic quarry is the Wells-Lamson quarry (which is bisected by Websterville Road).  South of Wells-Lamson lies the Smith quarry.  South of that is the Boutwell, Milne & Varnum quarry site (later known as the McCullough, McDonald & Pike site), where the NEMG crusher is presently located).  South still lies the Adams quarry. (Added on remand).

8.      Websterville Road marks the northern boundary of the ROA tract. (Added on Remand).

9.      Several roads transect the ROA property, including Graniteville Road.   Roads also connect work areas throughout the ROA property.

10.     Three sites, including the Smith quarry and the former Wells-Lamson crusher site, are located north of Graniteville Road.  Two quarrying sites, including the Adams quarry, are located south of Graniteville Road, as is the NEMG crushing operation at issue here.

11.     Granite quarrying is a process of cutting and extracting large blocks of stone for sale or to be further processed into monuments or other industrial products and then sold.  The large blocks of granite suitable for monuments and similar uses are referred to as "dimension stone."

12.     Quarrying activity moves deeper into the earth over time.  Typically, higher quality material is found the deeper one mines a quarry.

13.     The depth of a quarry is limited by the ability of derricks to lift the blocks out of the quarry or by the horizontal acreage available to build roads down into the quarry.

14.     At the inception of a quarry, the overburden soil and rock is removed to expose the underlying granite.  The granite closest to the surface is called "bedding" and is typically unsuitable for sale or use as dimension stone.  It is typical for ROA to need to remove 80 to 200 feet of bedding to reach suitable dimension stone.  Removal of overburden soil and bedding is referred to as quarry "development."  Development is expensive and produces considerable volumes of soil and stone which is either trucked off-site or piled on-site.

15.     This overburden is waste material unless the rock component is crushed into usable and salable product.  Up to 80 percent of quarry material is waste.

16.     "Grout" is waste granite which is not suitable for the high-end dimension stone.

17.     Crushing makes use of the waste from development material, including grout, by reducing the material to usable and salable sizes.

18.     Much of the material in ROA's grout piles is too large for crushing.

3

19.     The crushing process is common at dimension quarries in order to utilize the otherwise waste material.

20.     Crushing is not absolutely necessary for quarrying, but it does "help your bottom line," because it turns what would otherwise be waste material into a valuable product. (Added on remand).

21.     Crushing rock at various locations is customary in the industry because the equipment is often portable and the source of material (or "feedstock") may change.

22.     Rock crushing is also customarily intermittent. The frequency and location of rock crushing varies depending on the availability and location of feedstock and demand for crushed rock.

23.     Crushing entails drilling, blasting, removal, and transport of rock to the crusher equipment.  While many of today's crushing operations use portable equipment, material is typically moved from the extraction area to the crusher.

24.     Don Murray, ROA Engineer, has personal knowledge of crushing at ROA since the 1960s. Mr. Murray has completed significant research into crushing activities at ROA preceding 1960.

25.     Don Murray has worked at Rock of Ages since 1979.  (Added on remand).

26.     In the early 1900s there was a crushing plant in Barre installed by J.M. Boutwell at the Boutwell, Milne & Varnum Corporation quarry.  This crushing plant utilized waste stone from the quarries.[5]

27.     Photographic evidence shows that crushing activity took place around 1912 near the current compressor building on the south side of Graniteville Road in close proximity to NEMG's crushing location.  It was common at this time for crushed material to be placed in rail cars and transported off-site.

28.     As far back as 1926, the former Wells-Lamson quarry Company conducted crushing, including a crushing operation producing poultry grit and road aggregate.  This crushing continued through the 1940s and into the 1960s.  By 1948, this quarry and crusher had been conveyed to ROA.

---

[5] To better conform to the evidence before the Court, this finding is modified on remand by deleting "As early as 1904" and replacing it with "In the early 1900s."

4

29. This crushing operation described in Finding 28 was on the southern portion of the Wells-Lamson parcel (south of Websterville Road). Wells-Lamson also built a crushing operation on the northern side of Websterville Road in 1956. This crushing operation produced much of the sub-base for Interstate 89. This northern portion of the Wells-Lamson quarry was never aggregated into the ROA tract. (Added on remand).

30. Kelley Construction, Inc. contracted with ROA in August 1969 to remove overburden and rock in the Smith quarry. Activities included the planned crushing of approximately 40,000 cubic yards of material for sale. This work was undertaken between September 1969 and April 1970.

31. In 1988, Rock of Ages entered into a ten-year contract with Cooley Asphalt Paving Corporation, in which Cooley agreed to remove rock from ROA's grout piles and crush it off-site. This contract begins by noting that Cooley had been removing rock from ROA's tract for a "period of time" before the contract, and that the parties "wish[] to formalize this practice in a written agreement." From this, the Court infers that it was common practice in the quarrying industry to conduct crushing without formal contracts. (Added on remand).

32. McCullough Crushing, Inc. was awarded an Air Pollution Control Permit in January 1990 from the Vermont Agency of Natural Resources for a portable crushed stone/gravel processing plant.

33. From July 1990 to November 1990 McCullough Crushing removed more than 55,000 tons of crushed granite from the Adams quarry.

34. McCullough Crushing's equipment included a jaw crusher, a cone crusher, a conveyor, and a screen. This equipment is similar to NEMG's crushing equipment.

35. During the 1990s, McCullough's crushing took place in a similar area to NEMG's current location. This activity included similar truck traffic.

36. In 1992 and 1993, Pike Industries, a crushing subcontractor, primarily crushed rock at the northern Wells-Lamson parcel (off-site), but also crushed 18,118 tons of rock on the current NEMG site. (Added on remand).

37. The E.L. Smith & Company quarry included crushing activity from 2005 to 2007. The E.L. Smith & Company quarry is located approximately 0.8 miles to the north of NEMG operations.

38.    According to Donald Murray's credible testimony, rock crushing within the ROA tract has been "pretty much continuous" since 1979, when he started working for Rock of Ages. (Added on remand).

39.    NEMG entered into a contract with ROA to crush waste rock on-site into salable material.

40.    The rock crusher at issue, operated by NEMG between the Smith and Adam quarries, began operating in 2009 after the District 5 Environmental Commission Coordinator determined, in a December 17, 2008 jurisdictional opinion, No. 5-01, that the proposed crushing operation did not require an Act 250 permit.

41.    The District Coordinator issued additional jurisdictional opinions in 2010 and 2012 finding that rock crushing operations adjacent to the Smith quarry at Rock of Ages did not constitute a substantial change to a preexisting development and that the associated rock crusher therefore did not require an Act 250 permit.

42.    NEMG crushed 20,285 tons of material in 2010; 155,577 tons in 2011; 89,667 tons in 2012; and 59,279 tons in 2013.  The spike in crushing in 2011 was due to Tropical Storm Irene when the Vermont Natural Resources Board suspended Act 250 permitting needs for gravel and quarry operators due to the increased need for road-building material in order to rebuild infrastructure destroyed in the storm.

43.    NEMG's crushing activity is intermittent.  NEMG crushes when material is needed. Crushing typically does not take place during the winter months.

44.    In 2011, NEMG crushed on 53 days.  In 2012, NEMG crushed on 83 days, and in 2013, NEMG crushed on 43 days.

45.    NEMG's crushing operations have moved around the ROA property over this time.

46.    NEMG's current crushing operations include crushing and screening.  The equipment includes two jaw crushers, a cone crusher, a triple-deck screen, loaders, and excavators.

47.    The primary crusher breaks large material into smaller pieces that fit into the jaw crusher.  The primary crusher is a hydraulic hammer.

48.    There have been machinery improvements over time since the first crusher at the Boutwell quarry in the early 1900s; however, the process of crushing remains the same.  A large

6

primary crusher crushes rock followed by a smaller crusher further reducing rock size. Screens are used to separate the crushed rock by size suitable for various purposes.

49. NEMG does not own delivery trucks. Material is transported off-site by customers using their own trucks. NEMG does own one truck that hauls grout.

50. On June 5, 2013, ANR issued an Air Pollution Control Permit to Construct to NEMG for installation of crushing, screening, and conveying equipment. The ANR permit allows two primary crushers, two secondary crushers, three screening decks, discharge and stacking conveyors, and a diesel powered electric generator.

51. Neighbors in the area of crushing experience noise, dust, and traffic. Common noises are material being loaded or unloaded. Dust accumulates on house windows, outside furniture, lawns, and cars. When traveling on area roads, it is common to encounter dump trucks on Graniteville Road traveling to or from the crushing activity.

52. Dimension stone is typically transported on flatbed tractor trailer trucks. Crushed material, also called aggregate, is typically transported in dump trucks. ROA's dimension stone operations also use dump trucks.

53. ROA's dimension stone quarrying activities also create noise, dust, and truck traffic.

54. Suzanne Bennet has lived at her current residence on Park Street off Graniteville Road since 1961. (Added on remand).

55. Ms. Bennet experiences noises like stone on metal that are loud enough to wake her up in the morning and that continue until 8:00 or 8:30 at night. These noises started in roughly 2011. (Added on remand).

56. Ms. Bennett also experiences a coating of gritty dust on the exterior of her house, her lawn, her outdoor furniture, and her car. (Added on remand).

57. Ms. Bennet experiences increased truck traffic from the crusher. (Added on remand).

58. Pamela Austin has lived on Graniteville Road since 1982. Before that, she lived two houses down on Graniteville Road since 1969. (Added on remand).

59. Ms. Austin experiences loud noises from the crusher, which are distinct from the noises she hears from the ROA compressor house located behind her property. (Added on remand).

7

60.     Ms. Austin experiences a coating of dust on her property, which she attributes to dust coming off the dump trucks that haul aggregate from the NEMG crusher past her house. (Added on remand).

61.     Ms. Austin experiences increased truck traffic due to trucks hauling aggregate from the NEMG site. (Added on remand).

62.     Mark Bernier has lived at 11 Park Street in Graniteville, across the street from Suzanne Bennett, who is his mother-in-law, since 1993. (Added on remand).

63.      Mr. Bernier lives roughly 2,000 feet from the NEMG crusher.  Mr. Bernier experiences very loud noise from the crusher. (Added on remand).

64.     Mr. Bernier also experiences dust in the area. (Added on remand).

65.     Mr. Bernier experiences increased truck traffic on Graniteville Road from dump trucks hauling aggregate from the NEMG site.  (Added on remand).

## Conclusions of Law

After the Supreme Court's decision, the basic skeleton of Act 250 jurisdiction is unchanged.  A party proposing land "development" must obtain an Act 250 permit.  10 V.S.A. § 6081(a).  Any development that was commenced before June 1, 1970 is a "pre-existing development" and is exempt from the permit requirement.  10 V.S.A. § 6081(b); Act 250 Rule (2)(C)(8).  The preexisting development exemption disappears, however, if the land owner abandons the preexisting use.  In re Village of Cambridge Water Sys., No. 272, Findings of Fact, Conclusions of Law, and Order, at 8 (Vt. Envtl. Bd. Sept. 15, 1993).

A permit is also required for any "substantial change" to a preexisting development.  10 V.S.A. § 6081(b).  Vermont courts have long used a two-step test for substantial change—a test the Supreme Court affirmed in its North East Materials decision. 2015 VT 79, ¶¶ 16, 31 n.16.  First, a court must find that there is a "cognizable physical change" in the preexisting development.  Id. ¶ 43 (Eaton, J., dissenting) (quoting In re H.A. Manosh Corp., 147 Vt. 367, 370 (1986)).  If so (and only if so), the issue becomes whether the change has the potential for significant adverse impacts under the Act 250 criteria.  Id. (quoting Manosh, 147 Vt. at 370).

8

A landowner seeking a preexisting development exemption has the burden of proving that the development existed prior to June 1, 1970. Id. ¶ 20. The landowner must also prove that the preexisting use has not been abandoned. In re Village of Cambridge Water Sys., No. 272, Findings of Fact, Conclusions of Law, and Order, at 8 (Vt. Envtl. Bd. Sept. 15, 1993). Once a development is determined to be preexisting, "the burden shifts to the proponents of jurisdiction to demonstrate that a project represents a substantial change to the preexisting development." In re Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 10, 181 Vt. 589. The party seeking an exemption, however, retains the burden of producing sufficient information regarding the pre-1970 operation for the Court to determine whether a substantial change exists. N.E. Materials Grp., 2015 VT 79, ¶ 22.

In our original decision on the merits, we concluded that NEMG's rock crushing activities were within the scope of ROA's preexisting quarry development and did not constitute a substantial change to that development. In re N.E. Materials Grp. LLC A250 JO #5-21, No. 143-10-12 Vtec, slip op. at 10, 14–15 (Vt. Super. Ct. Envtl. Div. Apr. 28, 2014) (Walsh, J.). In reaching this conclusion, we considered ROA's large quarry tract as a whole. Id. at 12. We also rejected Appellants' claim that ROA abandoned its crushing activities after 1970, again basing this conclusion on an examination of the quarry tract as a whole. Id.

The Vermont Supreme Court reversed on appeal. N.E. Materials Grp., 2015 VT 79, ¶ 35. The Supreme Court agreed that it was appropriate to treat the ROA tract as a unified whole in determining that rock crushing is, in a general sense, part of ROA's preexisting development (and to shift the burden of persuasion to Appellants on that basis). See id. ¶ 24. But the Supreme Court concluded that we could *not* consider the tract as a whole in "establishing some sort of baseline" against which cognizable physical change could be measured. Id. at ¶ 24. Rather, the Supreme Court instructed us to apply "some level of granularity" to the tract in our cognizable physical change analysis on remand. Id. ¶ 30. Though the Supreme Court's reasoning for this holding rested heavily on the potential impacts from the crusher, the Supreme Court affirmed the Environmental Board's longstanding two-step test for substantial change: (1) is the challenged use a "cognizable physical change" to the development and (2) if

9

so, does this cognizable physical change have the potential for significant adverse impacts under the Act 250 criteria.[6] Id. ¶ 16.

Given this legal framework, the Supreme Court concluded that our opinion lacked sufficient "subsidiary findings" to support the conclusion that crushing falls within the scope of ROA's preexisting development; that ROA did not abandon its rock crushing operations; and that NEMG's crushing does not constitute a substantial change to ROA's development. 2015 VT 79, ¶¶ 32–36. We are instructed to revisit the evidence and reexamine these issues on remand. Id. ¶ 36.

I.      **Preexisting Development & Abandonment**

We turn first to whether rock crushing is within the scope of ROA's preexisting quarry development and whether ROA ever abandoned rock crushing. We consider the two issues together because Applicant bears the burden on both. See id. ¶ 24; In re Village of Cambridge Water Sys., No. 272, Findings of Fact, Conclusions of Law, and Order, at 8 (Vt. Envtl. Bd. Sept. 15, 1993). We consider both these issues using a tract-wide approach (as opposed to the more granular approach required for cognizable physical change, see N.E. Materials Grp., 2015 VT 79, ¶ 30).[7]

Our findings show a long history of rock crushing at various sites in the ROA tract. There was crushing at the Boutwell, Milne & Varnum parcel as early as 1912 and again in the 1920s. There was crushing on the southern portion of the Wells-Lamson quarry (which eventually

---

[6] The majority opinion maintains the two-step substantial change analysis. Id. ¶¶ 16, 31 n.16. The Supreme Court's primary rationale for rejecting our tract-wide approach to cognizable physical change was that the same activity might have different Act 250 impacts (or impacts on different neighbors) depending on where the activity occurs on the site. Id. ¶¶ 26–27. The majority's cognizable physical change rationale therefore takes account of Act 250 impacts, which, under the two-pronged approach, are only relevant *once there is a cognizable change*. The dissent was therefore concerned that the majority opinion collapsed the traditional test. Id. ¶ 43 (Eaton, J., dissenting). The majority responded, "[W]e are not, as the dissent suggests, 'collapsing' the two prongs of the substantial-change test into one." Id. ¶ 31 n.16. We emphasize this language and note that, on remand, we understand the two-step substantial change analysis to remain intact.

[7] The Supreme Court affirmed our tract-wide approach to preexisting-development analysis but was silent on whether abandonment required a more granular approach. We note that the non-abandonment requirement is not codified in the statute, but has been created by the Supreme Court's and the Board's Act 250 decisions. See In re Orzel, 156 Vt. 355, 359 (1985); In re Nadeau, No. 141, Findings of Fact, Conclusions of Law, and Order, at 3 (Vt. Envtl. Bd. June 23, 1983). Because the continuous use requirement is outgrowth of the statutory preexisting use exemption, we hold that a tract-wide approach is appropriate for both issues.

10

became part of Rock of Ages) from various dates between 1926 to 1959. There was crushing at the Smith quarry from 1969 and 1970. After 1970, McCullough Crushing, a subcontractor, crushed at the NEMG site in the early 1990s. Pike Industries crushed at the NEMG site in 1992 and 1993. The E.L. Smith Company had crushing on its site from 2005 to 2007. And Donald Murray testified, credibly, that crushing was "pretty much continuous" on the ROA tract since he began working for the company in 1979.

Furthermore, the Court finds that crushing is a naturally mobile and intermittent activity—quarry operators tend to move their crushing operations around a given site and use them on an as-needed basis, depending on demand for rock and availability of feedstock. Industry cycles and custom can be relevant in determining whether a project has been abandoned. In re U.S. Quarried Slate Prods., Inc., Nos. 279 & 283, Findings of Fact, Conclusions of Law, and Order (Reconsidered), at 22 (Vt. Envtl. Bd. Oct. 1, 1993). Because crushing is, by its very nature, intermittent, gaps in crushing do not indicate abandonment; they indicate continuous, intermittent crushing throughout the decades.

We also find that rock crushing is closely economically related to quarrying. Although crushing is not strictly necessary for quarrying, it certainly "helps your bottom line." While this finding by no means conclusively shows that crushing occurred continuously throughout the ROA tract, it does support the Court's reasonable inference that crushing was happening even when there are no concrete written records of it.

The Court also notes that, though landowners bear the burden of establishing a preexisting, continuous use, courts must (and do[8]) view the evidence landowners are able to provide through a practical lens. Before 1970, landowners had no notice that they might have

---

[8] In the major cases in which the Environmental Board found abandonment of a preexisting use, there was some affirmative evidence of abandonment and not merely a gap in evidence of use. See, e.g., In re U.S. Quarried Slate Prods., Inc., Nos. 279 & 283, Findings of Fact, Conclusions of Law, and Order, at 16, 22–23 (Vt. Envtl. Bd. Oct. 1, 1993) (holding that quarry tract was abandoned where, among other things, operator had filed a report with a federal agency stating that the quarry was "abandoned"); In re Champlain Marble Corp. (Fisk Quarry), No. 319, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. Oct. 2, 1996) (holding that blasting at a quarry tract was an abandoned use where there was no credible evidence of blasting since 1950 *and* where the quarry operator had failed to register the quarry with the federal Mining Safety and Health Administration after all active quarries were required to in 1973); cf. In re Orzel, 145 Vt. 355, 359 (1985) ("No evidence presented, nor findings made, indicates that the operations, although intermittent, were abandoned at any time.").

to prove the existence of uses that had been occurring on their land for decades, and consequently often kept no records. This is especially true of activities that would have seemed so part-and-parcel with the land's primary use that they were not worth formalizing in written documents. The fact that, for economic reasons, crushing often goes hand-in-hand with quarrying shows that crushing is precisely the kind of activity that might escape formal recording. The contract between ROA and Cooley Asphalt Paving Company, which notes in its preamble that Cooley had been crushing rock for ROA "for a period of time" without a written contract, illustrates this informality.

This practical approach does not relieve NEMG of its burden of establishing a preexisting, continuous development, but it does color the Court's understanding of how much evidence it can reasonably demand from NEMG and ROA. Rock of Ages has, through a diligent search of its historical records, uncovered impressive evidence of historical rock crushing. Given this evidence, and given the Court's findings about the economic relationship between quarrying and crushing and about the industry custom of sub-contracting to crush rock without formal, written contracts, the Court concludes that crushing was occurring continuously (though intermittently) on the ROA tract since the early 20th century. We therefore conclude that the ROA quarry, including crushing activities, is a preexisting development within the meaning of 10 V.S.A. § 6081(b) and Act 250 Rule 2(C)(8) and that it was never abandoned.

## II.    Substantial Change

Because we find that crushing is part of ROA's preexisting development and has not been abandoned, we turn to whether the siting of NEMG's crusher represents a substantial change to that development. In order for a challenged use to represent a "substantial change" to a preexisting development, it must first be found to be a "cognizable physical change" to the development. If, and only if, the challenged use is a cognizable physical change, the issue becomes whether the use has the potential for significant impacts under Act 250. N.E. Materials Grp., 2015 VT 79, ¶ 43 (Eaton, J., dissenting).

a.    <u>Cognizable Physical Change</u>

In its decision, the Supreme Court held that we could not use a tract-wide approach in analyzing whether the NEMG crushing operation is a cognizable physical change to ROA's preexisting development. <u>Id</u>. ¶ 30. In other words, historic instances of crushing at other sites within the ROA tract cannot "establish[] some sort of baseline defeating any claim that NEMG's present operations constitute a cognizable change." <u>Id</u>. ¶ 24. Rather, we must give appropriate "weight" to those instances of historic crushing, <u>id</u>. ¶ 30 n.14, and apply "some level of granularity" to the tract. <u>Id</u>. ¶ 30.

While it is clear from the Supreme Court's decision that we may not use a tract-wide approach in analyzing cognizable physical change, we are left with little guidance on what approach to apply instead. We note first that the Supreme Court's reasoning is not fully compatible with traditional preexisting-development/substantial-change analysis. The Environmental Board's precedents use a binary approach: either a given use falls within the scope of a preexisting development or it represents a substantial change to that development. See, e.g., <u>In re Barlow</u>, No. 234, Findings of Fact, Conclusions of Law, and Order, at 9 (Vt. Envtl. Bd. Sept. 20, 1991). That is not to say that these cases are unsophisticated. In <u>In re Clifford's Loam & Gravel, Inc.</u>, an early preexisting development/substantial change case, the Board outlined four factors that could be used to restrict the boundaries of the "preexisting development" that could serve as a baseline for measuring cognizable physical change. <u>In re Clifford's Loam & Gravel</u>, No. 90, Findings of Fact, Conclusions of Law, and Order, at 3 (Vt. Envtl. Bd. Nov. 6, 1978). But the analysis in these cases is still binary in the sense that the preexisting development, once defined, necessarily serves as the baseline for measuring substantial change: either a given use is within the scope of a preexisting development or it is a substantial change to that development. See <u>In re Clifford's Loam & Gravel, Inc.</u>, No. 90, Findings of Fact, Conclusions of Law, and Order, at 3 (Vt. Envtl. Bd. Nov. 6, 1978) (holding that public highways or waterways might "*defin*[*e*] *the limits of the pre-existing operation*" (emphasis added)); <u>In re Weston Island Ventures</u>, No. 169, at 5 (Vt. Envtl. Bd. June 3, 1985) (quoting <u>Clifford's Loam and Gravel</u>); <u>In re Barlow</u>, No. 234, Findings of Fact, Conclusions of Law, and Order, at 9 (Vt. Envtl. Bd. Sept. 20, 1991) (characterizing the physical expansion of the gravel pit as a preexisting

13

development issue, and concluding that the area designated for expansion was "part of a pre-existing gravel pit" and therefore not a cognizable physical change).

This is not the case with the Supreme Court's decision. The Supreme Court upheld our tract-wide approach to preexisting development analysis, but held that we could not use a tract-wide approach to cognizable physical change. See N.E. Materials Grp., 2015 VT 79, ¶¶ 24, 30. The Court's opinion then re-characterized the Clifford's Loam and Gravel factors as part of the substantial change analysis. See id. ¶ 29.

The Supreme Court did not explain this departure. It is possible that the Supreme Court intended to simply relocate the Clifford's line-drawing analysis from the preexisting development prong to the substantial change prong, leaving it substantively unchanged. But if this were the case, the only practical import of the Supreme Court's holding would be to lighten the burden on landowners by reassigning the burden of persuasion on the Clifford's factors from landowners to the proponents of jurisdiction (since landowners bear the burden of persuasion on preexisting use issues and proponents bear the burden of persuasion on substantial change issues, N.E. Materials Grp., 2015 VT 79, ¶ 20). If this were the Supreme Court's sole intent, it could have explicitly said so.[9] Rather, the Supreme Court's opinion suggests that, in applying the Clifford's factors in the substantial change analysis, we should not draw hard lines around some baseline portion the ROA tract, but rather that we assign appropriate "weight" to different uses on the ROA tract.[10] N.E. Materials Grp., 2015 VT 79, ¶ 30, n.14 (citing Clifford's Loam & Gravel) ("We conclude that factors such as distance between sites and separation by a public highway affect the weight to be given to . . . operations at another site within a tract. . . . But we do not adopt a bright-line rule precluding any consideration of pre-1970 activities at formerly independently owned quarries in

---

[9] The Court did explicitly shift the burden of persuasion on "whether the specific parameters of a proposed post-1970 development are consistent with the scope of an established preexisting development" from landowners to the proponents of jurisdiction, thereby converting preexisting development into a "threshold" issue. N.E. Materials Grp., 2015 VT 79, ¶ 22. But the Court did not acknowledge that it was reassigning the burden of defining a baseline for the cognizable physical change analysis.

[10] If the Supreme Court's opinion simply relocated the line-drawing analysis from the preexisting development prong to the cognizable physical change prong, there would be no room for "weight[ing]" uses; under the Board's preexisting development precedents, either uses continuously occurred on the "baseline" development or they did not.

14

connection with post-1970 proposed development." (internal citation omitted)). We therefore do not interpret the Supreme Court's holding to require us to actually choose a precise "level of granularity" for the ROA tract or to delineate which parts of the tract may serve as a "baseline" for measuring substantial change.

The fundamental question in cognizable physical change analysis is whether the development is being "operated in essentially the same manner as it was before June 1, 1970." F.W. Whitcomb Constr. Co., No. 408, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. Dec. 19, 2002) (internal quotation omitted). In the gravel cases, which the Supreme Court considered analogous, id. ¶ 30, the Environmental Board recognized that gravel pits, by their very nature, expand physically as gravel is extracted. N.E. Materials Grp., 2015 VT 79, ¶ 29 (quoting In re Weston Island Ventures, No. 169, Findings of Fact, Conclusions of Law, and Order, at 6 (Vt. Envtl. Bd. June 3, 1985)). Thus, under these cases, gravel pits could continue to expand at their historic rates without triggering Act 250 jurisdiction because they were being operated in essentially the same manner as they were before 1970. Id. If, however, a gravel pit either dramatically increased its rate of extraction or expanded into a sufficiently distinct portion of a tract, the expansion could be considered a cognizable physical change. Id. ¶ 30. In determining whether the area designated for expansion is sufficiently distinct from the already-developed area, these cases considered whether (1) new land had been acquired, (2) a substantial distance separated the historic and expanded gravel sites, (3) the operations themselves had changed (such as by adding a stone crusher) and (4) the presence of intervening rights of way or public waterways. Id. ¶ 29 (quoting Clifford's Loam & Gravel). The Board also considered the previously undeveloped character of an area designated for expansion relevant in finding than an expansion was inconsistent with pre-1970 growth. Compare In re Weston Island Ventures, No. 169, at 5 (Vt. Envtl. Bd. June 3, 1985) (holding that an expansion to a previously undeveloped area across Route 100 was a cognizable physical change) with In re Barlow, No. 234, Findings of Fact, Conclusions of Law, and Order, at 9 (Vt. Envtl. Bd. Sept. 20, 1991) (holding that expansion of gravel extraction across a residential right of way to another pit that had already been used for extracting sand and dirt was not).

15

Just as gravel pits naturally and inherently expand, rock crushing operations are naturally and inherently mobile. Therefore, just as the gravel cases asked whether a particular expansion of a gravel pit was consistent with a pit's historic pattern of expansion, we ultimately interpret the Supreme Court's decision to require us to determine whether, under the Clifford's factors, the *relocation* of rock crushing operations from one area of a well-developed, preexisting quarry to another is consistent with the rock crushing operation's historic pattern of relocation. If, for instance, most rock crushing within a contiguous parcel had moved from site to site within a relatively contained area, and then the landowner sought to begin crushing in a previously undeveloped area a comparatively significant distance away and across comparatively significant natural boundaries, this move might mark a cognizable change. If, on the other hand, crushing has historically occurred on widely scattered, well-developed areas on a tract, a move to yet another (already developed) site, even across natural boundaries and even at significant distances, might still mean the development is "operated in essentially the same manner as it was before June 1, 1970." F.W. Whitcomb Constr. Co., No. 408, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. Dec. 19, 2002) (internal quotation omitted).

Applying this approach to the NEMG crusher on remand, we conclude that the crusher fits the latter fact pattern more closely than the former, and is not a cognizable physical change to ROA's preexisting crushing operations. Again, we find that rock crushing is an inherently mobile activity. Quarry operators tend to move their crushing operations around their quarries in accordance with customer demand and supply of waste rock feedstock. This finding is supported by the "subsidiary" finding that rock crushing occurred at various sites within the ROA tract in significant quantities for over a century. Before 1970, there were rock crushing operations on the NEMG site, on Smith quarry site (roughly 0.8 miles from the NEMG site and across a public highway), and on the southern portion of the former Wells-Lamson quarry (roughly 1.6 miles from the NEMG site, at what is now the northernmost point of the ROA tract). Thus, movement across significant distances and public highways has always characterized ROA's (or its constituent quarry operators') crushing operations. And, as in In re Barlow, the NEMG site *has* seen crushing before. In re Barlow, No. 234, Findings of Fact,

16

Conclusions of Law, and Order, at 9 (Vt. Envtl. Bd. Sept. 20, 1991). It is not as though the present relocation of crushing to the NEMG site is an unprecedented expansion of rock crushing to a previously undeveloped area. This pattern of mobile and intermittent crushing sets the baseline for how distinct a relocation within the tract must be to trigger Act 250 jurisdiction. While the NEMG site is separated by a public highway and by some distance from other proven sites of historic crushing on the ROA tract (namely, the Smith and southern Wells-Lamson sites), these distances and intervening boundaries are characteristic of ROA's pattern of mobile and responsive crushing operations.

We also find that the other basis for a cognizable physical change—an increase in rate or intensity of activity, see id. ¶ 34—is not present in this case, for we are not persuaded that the NEMG crusher exceeds historic quantities of rock crushing. ROA and NEMG produced a contract between ROA and a crushing subcontractor anticipating that 40,000 cubic yards of rock would be crushed at the Smith quarry[11] in the six months between September 1969 and April 1970.[12] NEMG also produced yearly crushing totals for all the years it has operated.[13] Appellants, who bear the burden of persuasion, introduced no evidence showing that NEMG's

---

[11] We recognize that this evidence relates to the Smith quarry, which is roughly 0.8 miles north of the NEMG site across Graniteville Road. But, again, we do not interpret the Supreme Court's decision to place hard limits (or to require us to place hard limits) on what evidence of historic crushing may be relevant in establishing a baseline for ROA's pre-1970 crushing operations. As we discussed in Part I, we hesitate to require landowners to establish, with scientific accuracy, the precise rates and intensities of their land uses before 1970. Before 1970, landowners had no notice that they might someday be required produce evidence in court of the way they had been using their land for decades. We therefore review evidence landowners can supply through a practical lens. Here, our overarching understanding of rock crushing operations is that they move within a quarry tract based on supply of rock and demand for gravel, but they generally remain unchanged otherwise. We therefore consider evidence of rates of crushing at the nearby Smith quarry to be sufficient evidence to form a baseline of "amount and frequency of pre-1970 crushing." See N.E. Materials Grp., 2015 VT 79, ¶ 34.

[12] On cross-examination, Appellants pointed out that an invoice for services under the contract did not distinguish between amounts ROA owed to its subcontractor (for the service of removing overburden rock) and amounts the sub-contractor owed to ROA (as a royalty for rock actually crushed). Donald Murray, ROA's primary witness, conceded that this might show that no rock was actually crushed. The Court finds it equally possible that this handwritten invoice was merely hastily done. Appellants have, therefore, not persuaded the Court that ROA's and NEMG's evidence shows that anything other than 40,000 cubic yards of material were crushed under the contract.

[13] We do not consider crushing from 2011 or 2012 to be representative of ROA's post 1970 crushing quantities, since NEMG was crushing rock for road reconstruction after Hurricane Irene under emergency conditions in these years.

17

expected yearly crushing totals differ from this historic benchmark.[14]  We therefore find that the NEMG crusher does not represent any marked increase in crushing quantity, and find no cognizable physical change on that basis.

In summary, while we do not hold the mere fact that crushing occurred on the NEMG site nearly a century ago to be conclusive in defeating a claim of cognizable physical change, we do hold that crushing at the NEMG site is no more dramatic a relocation than other relocations in ROA's pre-1970 history, especially considering that the NEMG site has experienced crushing in the past.  We conclude that the present relocation of ROA's crushing to NEMG's site is consistent with the intrinsically portable nature of rock crushing and with ROA's historic pattern of mobile crushing operations.  We therefore conclude that the ROA tract is being "operated in essentially the same manner as it was before June 1, 1970," and that no cognizable physical change has occurred. F.W. Whitcomb Constr. Co., No. 408, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. Dec. 19, 2002) (internal quotation omitted).

b.      Potential for Significant Impacts

Finally, we address the last prong in determining Act 250 jurisdiction: the potential for a cognizable change to have significant impacts under Act 250.  We emphasize again that we do not consider the Supreme Court's opinion to alter the sequence of the traditional two-step substantial change analysis, where we do not examine potential impacts unless we find a cognizable physical change.  In re N.E. Materials Grp., 2015 VT 79, ¶ 30 n.14  Because we conclude there is no cognizable physical change to the ROA development, we do not reach the "impacts" prong of the substantial change analysis.

We do note, however, that even if the relocation of the NEMG crusher were a cognizable physical change, we think it unlikely to have significant Act 250 impacts.  In order to trigger Act 250 jurisdiction, a cognizable physical change must have the potential for *significant* Act 250 impacts.  Act 250 Rule 2(C)(7).  While the Environmental Board and the Supreme Court

_____

[14] The contract for crushing on the Smith quarry in 1969 measured crushed rock in cubic yards, whereas the yearly crushing totals NEMG produced measure crushed rock in tons.  Appellants introduced no evidence to enable the Court to compare these figures, and did not suggest that NEMG's current crushing exceeds the quantities crushed in 1969 on the Smith quarry.

have repeatedly held that potential (and not actual) impacts are sufficient to trigger Act 250 jurisdiction, this does not diminish the requirement that those impacts be significant. In re Barlow, 160 Vt. 513, 522 (1993) ("Any change in use has the potential for some impact on the statutory criteria. Thus, while we agree that the Board may act on potential impacts, we believe a finding of *significant* impacts is necessary if the requirement of 'substantial change' is not to be illusory."). This is consistent with the Supreme Court's language about the general purposes (and jurisdictional limits) of Act 250—that, in passing Act 250, the Legislature "intended to reach only those land use changes 'where values of state concern are implicated through large scale changes in land utilization.'" In re Spencer, 152 Vt. 330, 334 (1989) (quoting In re Agency of Admin., 141 Vt. 68, 76 (1982)).

Furthermore, it is essential to isolate those impacts stemming from the cognizable physical change from impacts that stem from baseline operation of the preexisting development; only the former are relevant to whether a cognizable physical change will have significant impacts under Act 250. For instance, in In re Kelly Green Recycling Facility, No. 293, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. Aug. 24. 1994), a recycling facility took over operation of a former Goodyear plant, which was a preexisting development. The Environmental Board concluded that the recycling facility's disposal of chemicals did not represent a cognizable physical change to the previous operator's use of the plant, but that the recycling facility's dependence on truck transportation did. Id. The Board then proceeded to analyze whether the *truck traffic* (and not the entire operation) had the potential for significant impacts under Act 250.[15] Because we must consider impacts from a cognizable physical change in isolation, and these impacts must be significant, the potential impacts from the relocation of the NEMG crusher would only be significant if the relocation will have new and separate impacts under Act 250.

---

[15] We draw analogous support for this proposition from the rules limiting the extent of Act 250 jurisdiction over a preexisting development during the permitting process that follows a finding of substantial change. The Supreme Court has repeatedly held that, where a cognizable physical change is distinguishable from the rest of a preexisting development, permitting jurisdiction extends only to the cognizable change, and not the entire project. See In re Hale Mountain Fish & Game, 2009 VT 10, ¶ 6 (quoting In re Black River Valley Rod & Gun Club, Inc., No. 2S1019-EB, Memorandum of Decision, at 14 (Vt. Envtl. Bd. June 12, 1997)).

Our review of the facts shows that neighbors near the NEMG crusher experience noise, dust, and traffic impacts, all of which are relevant under Act 250. See 10 V.S.A. § 6081(a)(1) (air pollution); § 6081(a)(5)(A) (traffic); § 6081(a)(8) (noise). But the evidence in this matter does not show that the relocation causes new impacts. The relocation simply impacts new neighbors. Thus, even if we were to conclude that there is a cognizable physical change, we would conclude that Appellants have failed to persuade us that the impacts of noise, dust and traffic are any different than the impacts experienced by neighbors of crushing operations in other locations at the ROA tract.

## III.     Motion to Strike

Having addressed the merits of this remanded appeal, we turn finally to a procedural matter. NEMG has moved to strike a portion of Appellants' post-remand brief. The challenged portion requests that we remand this case to the District Commission if we find that the NEMG crusher is subject to Act 250 jurisdiction. It also argues that we should remand a related appeal pending before the Court (in which Appellants challenge NEMG's Act 250 permit for an asphalt plant on its site) so that the District Commission may consider the two projects and their cumulative effects as a single development. Because we find that the NEMG crusher is not subject to Act 250 jurisdiction, we deny Appellants' request for remand. We also decline to "strike" the request from the record, since the request is not "redundant, immaterial, impertinent, or scandalous . . . ." V.R.C.P. 12(f).[16] Appellants' request is not an attempt to argue the merits of the related asphalt plant appeal in this case. It is a procedural recommendation responsive to this Court's suggestion, after remand of this appeal, that parties file briefs proposing next steps for this case. NEMG's motion to strike is therefore also denied.

### Conclusion

On remand, we conclude that the NEMG rock crushing operation is part of ROA's preexisting quarry development, that ROA did not abandon rock crushing at any time before or after 1970, and that rock crushing at the NEMG site is not a cognizable physical change to ROA's

---

[16] We are also not convinced that Rule 12(f) can be used to strike material in motions, since the text of the Rule refers only to pleadings. V.R.C.P. 12(f).

preexisting development.  Because we find no cognizable physical change to the development, we do not reach the issue of Act 250 impacts.  We therefore conclude that the NEMG rock crusher is not subject to Act 250 jurisdiction.

Electronically signed on December 23, 2015 at 3:45 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division