Eaton, J.,
¶ 23. dissenting. In my view, the Environmental Division followed this Court’s remand instructions and issued a ruling supported by the law and the evidence. In reversing the Environmental Division’s decision, the majority — despite stating otherwise — effectively collapses the established two-part substantial-change test and places the burden on North East Materials Group (NEMG), contrary to our law, to prove that its challenged rock-crushing operations are not a substantial change to the preexisting development. Accordingly, I respectfully dissent.
¶ 24. The majority faults the Environmental Division for failing to make significant new findings to support its rationale for its decision following our remand, even though we required the Environmental Division only to “revisit” its findings. In re North East Materials Group LLC Act 250 JO #5-21, 2015 VT 79, ¶ 36, 199 Vt. 577, 127 A.3d 926 [hereinafter NEMG I]. It was manifestly evident in the first appeal that during the two-day evidentiary hearing NEMG had mustered every bit of available evidence of past rock-crushing operations on the Rock of Ages (ROA) industrial complex over the past hundred-plus years — a task made difficult by the long existence of the complex and the lack of record-keeping of those operations in the distant past. Yet, we did not hold that NEMG was required to obtain an Act 250 permit with respect to the challenged rock-crushing operations.
¶ 25. Rather, we accepted the Environmental Division’s “broad approach” of considering the entire complex with respect to determining whether the challenged rock-crushing operations were part of a preexisting development exempt from Act 250, but *601 concluded that a “tract-wide approach” could not be applied in assessing whether those particular operations constituted a substantial change to the preexisting development. Id. ¶¶ 24, 29. We noted that the Environmental Division had “considered any pre-1970 crushing activity anywhere on the entire 1170 acres owned by ROA as establishing a preexisting development including rock-crushing activities, and as establishing a baseline of rock crushing such that new rock-crushing facilities or operations anywhere on, the tract would not constitute a substantial change.” Id. ¶ 23 (emphasis in original). We rejected this position with respect to determining whether the challenged rock-crushing operations constituted a substantial change to a preexisting development, stating that it would mean “the absence of prior crushing activity in the vicinity of NEMG’s crushing operations would be irrelevant, because previous rock crushing elsewhere on ROA lands, even miles away, could establish a baseline against which NEMG’s operations would be measured in a substantial-change analysis.” Id. (emphasis added). We did not “agree that instances of crushing operations decades ago and miles away from the site of NEMG’s present operations [could] be viewed as establishing some sort of baseline defeating any claim that NEMG’s present operations constitute a cognizable change.” Id. ¶ 24 (emphasis added).
¶ 26. Instead, we held that “some level of granularity (rather than a uniform ‘tract-wide’ approach) is required in assessing substantial change in connection with quarrying operations.” Id. ¶ 30. We explained that “similar operations [taking] place prior to 1970 at a different site within the same tract” could be considered, with “factors such as distance between sites and separation by a public highway affect[ing] the weight to be given to the fact of pre-1970 operations at another site within the tract.” Id. ¶ 30 n.14; see also id. ¶ 31 (“The deployment of heavy industrial equipment that qualifies as development in a vicinity where it has not previously been deployed is a cognizable change.” (emphasis added)).
¶ 27. Accordingly, we did not hold that an Act 250 permit was required. Nor could we have expected that significant new findings on past rock-crushing activities at the ROA site would be forthcoming on remand, given NEMG’s exhaustive historical search for evidence concerning such operations. Rather, we remanded the case for the Environmental Division to “revisit its findings,” in *602 relevant part, concerning whether “NEMG’s operations in this case give rise to a substantial change, analyzed consistent with the guidance set forth” in the opinion. Id. ¶ 36. That guidance, as detailed above, called for a more granular approach, taking into account relative distances from previous rock-crushing operations, in determining whether the challenged operations constituted a substantial change.
¶ 28. That is precisely what the Environmental Division did on remand. The Environmental Division stated that it was revisiting the existing record after the parties — not surprisingly given the thoroughness of the evidence presented in the first evidentiary hearing — declined an opportunity to introduce new evidence. The Environmental Division further indicated that it was supplementing its findings with several facts to “clarify the relative locations of the different historical crushing sites on the ROA tract.” In attempting to apply this Court’s analysis in NEMG /, the Environmental Division struggled to make sense of our determination that a tract-wide approach could be used in assessing whether the challenged operations were part of a preexisting development but not in determining whether those operations constituted a substantial change to any such preexisting development. Recognizing that this Court directed it to assign appropriate weight to different uses on the ROA tract depending on their location within the tract, and that the fundamental question was whether the preexisting development was being operated in the same manner as before the enactment of Act 250, the Environmental Division concluded that the challenged rock-crushing operations were not a cognizable change from past use.
¶ 29. The Environmental Division found that: (1) the historical quarries formed a north-south line within the ROA industrial complex; (2) there had been rock-crushing operations in the early twentieth century and after 1970 on the challenged site, which is located within the second southernmost of the four quarries; and (3) there had also been pre-1970 crushing operations of at least a similar rate and intensity at the second northernmost quarry approximately 0.8 miles from the challenged site and at the northernmost quarry approximately 1.6 miles from the site. Considering the relative distance between the various rock-crushing operations over the past one-hundred-plus years along the line of quarries within the industrial complex, the Environmental Division concluded that the challenged crushing operations fit squarely *603 within the pattern of crushing operations that had occurred intermittently over many decades before the enactment of Act 250 — a pattern of relocating the operations from one area of a preexisting quarry to another as needed depending on where the stone was being extracted. The Environmental Division further concluded that there was no cognizable change in activity because the crushing operations were part and parcel of dimension stone quarrying and were inherently mobile and intermittent in nature.
¶ 30. In short, just as this Court directed, the Environmental Division revisited its findings, adding a few with respect to the specific location of past rock-crushing operations, and took a more granular approach in determining whether there had been a cognizable change with respect to the challenged crushing operations. After carefully considering the extensive record, the Environmental Division concluded — like three different District 5 Environmental Commission coordinators before it — that there was no cognizable change and thus no Act 250 permit was required. Both the record and the law fully support the Environmental Division’s findings, its rationale, and its ultimate conclusion.
¶ 31. The majority rejects the Environmental Division’s new rationale as inconsistent with the substantial-change analysis set forth in NEMG I because it cut off the analysis at the cognizable-change step. By rejecting the Environmental Division’s analysis on this basis, the majority overtly collapses the established two-part substantial-change test, even though this Court explicitly stated in NEMG I, as recognized by the Environmental Division on remand, that we were not collapsing the two prongs of the test into one. 2015 VT 79, ¶ 31 n.16; see In re Vt. RSA Ltd. P’ship, 2007 VT 23, ¶¶ 10-11, 181 Vt. 589, 925 A.2d 1006 (mem.) (noting that Environmental Board analyzed potential for significant impacts only after finding that cognizable-change prong had been met); In re F.W. Whitcomb Constr. Co., Declaratory Ruling No. 408, slip op. at 11 (Vt. Envtl. Bd. Aug. 28, 2002), https://perma.cc/WCL7-ARWQ (“Because the Board finds no cognizable physical change, the Board does not go on to determine whether any change has the potential for significant impact under any Act 250 criterion.”).
¶ 32. The majority also effectively imposes upon NEMG the burden of proving no substantial change, while at the same time acknowledging that our law places that burden of proof on the party claiming a substantial change to a preexisting development. *604 As the majority recognizes, a party seeking to impose Act 250 jurisdiction with respect to a preexisting development has the ultimate burden of showing that there has been a substantial change to the preexisting development. Vt. RSA Ltd. P’ship, 2007 VT 23, ¶ 10. To be sure, the Environmental Board ruled in past decisions that the holder of the Act 250 exemption has the burden of producing sufficient information on pre- and post-1970 operations to allow the finder of fact to ascertain if a substantial change has occurred. In re Thomas Howrigan Gravel Extraction, Declaratory Ruling No. 358, slip op. at 14 (Vt. Envtl. Bd. Aug. 30, 1999), https://perma.cc/VG6M-CQQB. But, as the majority recognizes, this burden of production is placed on the owner/operator of the preexisting development because of the practicality of placing the burden on the party most likely to have that information. That burden was met here.
¶ 33. The instant case is far different than those relied upon by the majority, in the sense that NEMG was not withholding information that it should have kept. Cf. In re John Gross Sand & Gravel, Declaratory Ruling No. 280, slip op. at 11 (Vt. Envtl. Bd. July 28, 1993), https://perma.cc/7C3A-5AXM (stating petitioner’s claim that records concerning various businesses were commingled and intertwined did not excuse petitioner “from meeting its burden of production” regarding gravel extraction rates before and after 1970). Nor is this a situation where the owner/operator of the preexisting development did not disclose the nature of the proposed activity. Cf. In re Orzel, 145 Vt. 355, 359, 491 A.2d 1013, 1015 (1985) (noting Board’s finding that petitioners had no specific proposal for their operation, and stating that Board could not “determine whether some activity constitutes a substantial change to a pre-existing operation unless it is made aware of what that activity is”). Rather, as the Environmental Division found, the lack of extensive information was due to the hundred-year history of the preexisting development and the typical lack of record-keeping for past crushing activities. The Environmental Division also found that because rock-crushing was “part-and-parcel” with dimension stone quarrying, it “is precisely the kind of activity that might escape formal recording.”
¶ 34. Still, NEMG was able to uncover through a diligent search of historical records, as the Environmental Division found, “impressive evidence of historical rock crushing” supporting the Environmental Division’s conclusion that the challenged crushing *605 operations were not a cognizable change from pre-1970 crushing activities occurring intermittently over more than a hundred years on a mile or two line of quarries within the heart of an industrial quarry complex. On the other side, the objecting parties, upon whom the burden of proof of showing a substantial change ultimately rests, produced nothing showing that there had been a substantial change. As the Environmental Division found, rock crushing has been integrally intertwined with dimension stone quarrying at the ROA complex and has gone on continuously, albeit intermittently, since the early twentieth century. Thus, per this Court’s remand instructions, the Environmental Division engaged in a more granular approach, ultimately concluding that the inherently mobile rock-crushing operations had continued intermittently for over a century within a line of quarries that included the site of the challenged rock-crushing operations as well as other locations within less than a mile to about a mile and a half of the site.
¶ 35. The majority has never made it clear what are the parameters of its required “more granular” approach, but apparently, judging from this opinion, NEMG and other companies operating within the ROA industrial complex will now have to obtain a new Act 250 permit for rock crushing every time they move their inherently mobile rock-crushing operations to a new spot in the quarry, despite the evidence of intermittent rock crushing at the NEMG quarrying operations for over a century. Mirabile dictu! That the majority may not agree with the facts as found by the Environmental Division does not mean that those facts found are insufficient or unsupported. The Environmental Division did as it was instructed and reached legal conclusions supported by the facts it found. I would affirm the Environmental Division’s decision and therefore I respectfully dissent.
¶ 36. I am authorized to state that Justice Skoglund joins this dissent.